**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Luis I. Hernandez, | ) | |
| | ) | **ORDER GRANTING REQUEST TO** |
| Petitioner, | ) | **AMEND AND REPORT** |
| vs. | ) | **AND RECOMMENDATION** |
| | ) | |
| Timothy Schuetzle, Warden, | ) | |
| North Dakota State Penitentiary, | ) | Case No. 1:07-cv-056 |
| | ) | |
| Respondent. | ) | |

Before the Court is Luis I. Hernandez's Petition Under 28 U.S.C. § 2254 for a Writ of

Habeas Corpus by a Person in State Custody.  For the reasons set forth below, the undersigned

grants in part a request to amend the petition and recommends that Hernandez's petition, as

amended, be denied.

I.      **BACKGROUND**

        A.      **The trial and motion for new trial**

        On November 8, 2005, Hernandez was found guilty of the offense of gross sexual imposition

in violation of N.D.C.C. § 12.1-20-03 following a five-day jury trial.  (Exs. 1 & 25).[1]  During the

trial, Hernandez was represented by retained counsel.

        The parties agree that the following excerpt from the North Dakota Supreme Court's decision

on Hernandez's direct appeal provides basic background information.

        [¶ 2]  The State charged Hernandez with gross sexual imposition under
        N.D.C.C. § 12.1-20-03 for allegedly engaging in a sexual act with the complainant,
        the twelve-year-old daughter of his former girlfriend.  At trial, the State presented
        evidence that Hernandez picked up the complainant after school on May 22, 2003,
        and took her to a Fargo motel, where he engaged in sexual acts with her.  The

---

        [1]  Documents relating to matters through the judgment of conviction have been filed at Doc. No. 9 and are
marked Exhibits 1-25.  Documents pertaining to the state postconviction relief proceedings have also been filed at Doc.
No. 9 and are marked Exhibits 1-22.  These will be referred to by the identifier "PC" followed by the exhibit number.

complainant testified Hernandez ultimately drove her to her mother's home, where the complainant told her mother that Hernandez had raped her. The complainant's mother testified she found a letter handwritten in Spanish in the screen door of her house about a day or two after Hernandez was arrested. The letter was not addressed to a recipient and was not signed by its author. The State introduced an English translation of the letter, which stated "she went to the hotel with me and we had sex and that I didn't rape her" and "I don't deny that I got involved with her but she gave it to me voluntarily." The State also introduced expert testimony that identified Hernandez as the author of the handwritten letter.

[¶ 3] Hernandez claimed the complainant's mother manipulated her daughter to fabricate the prosecution against him. There was evidence that Hernandez and the complainant's mother had a stormy relationship over the previous ten years. They were never married, but they had a son together in 1994. According to Hernandez, the complainant's mother did not approve of his relationship with his current girlfriend, and in May 2003, his physical mobility was severely limited by a February 2003 automobile accident and a "halo" device he wore as part of his rehabilitation for a spinal cord injury. Hernandez testified he met his son, the complainant's mother, and the complainant at a Fargo motel on May 22, 2003. According to Hernandez, his son and the complainant went swimming in the motel pool, and the complainant's mother then tried to engage in sexual activity with him in the motel room. Hernandez testified the two children subsequently returned from swimming and then showered, and everyone left the motel together. He claimed he did not engage in any sexual activity with the complainant on May 22, 2003. A jury found Hernandez guilty of gross sexual imposition. The trial court denied Hernandez's motion and amended motion for a new trial.

State v. Hernandez, 2005 ND 214, ¶¶ 2-3, 707 N.W.2d 449, 452-53 (affirming conviction). Other matters that occurred during the course of the trial, which are pertinent to specific issues, will be addressed later. Also, the twelve-year-old victim will be referred to as "L.H."

Hernandez's trial counsel filed a motion for new trial on November 15, 2004, alleging the following errors:

1.   The trial court erred in admitting evidence of uncharged prior acts of sexual abuse.

2.   Destruction of exculpatory evidence, *i.e*, the failure of the hospital's laboratory to preserve a nonmotile semen sample taken from L.H.

3.   Admission of expert testimony of a handwriting comparison by a person who was not qualified to give an expert opinion.

2

This motion was supplemented by an amended motion for new trial filed on November 22, 2004, which added the grounds that the English translation of a letter allegedly written by Hernandez was erroneously received as an exhibit without being redacted to eliminate references to prior uncharged acts of sexual relations.  (Exs. 1, 16-17).  On January 28, 2005, the court summarily denied the motion and sentenced Hernandez to twenty years in prison with eight years suspended for a five-year period of supervised probation.  (Exs. 1, 3, & 19).

> **B.**     **The direct appeal to the North Dakota Supreme Court**

Hernandez, through his retained trial counsel, then brought a direct appeal to the North Dakota Supreme Court in which he raised the following issues:

1.     The trial court erred  in admitting evidence of uncharged prior acts of sexual abuse.

2.     The trial court erred in receiving the letter allegedly written by the defendant without the necessary redactions for uncharged conduct.

3.     The trial court erred in allowing "junk science" testimony from the State's handwriting expert.

4.     The trial court erred in allowing the state to present evidence that could not be tested or challenged because potentially exculpatory evidence was destroyed.

5.     The warrant for the bodily fluid and tissue samples was fatally defective.

The North Dakota Supreme Court denied the first four issues on the merits.  With respect to the last issue, the court concluded it had been waived because it had not been presented as part of the motion for new trial.  Hernandez, 2005 ND 214, ¶¶ 5-34.

C.     **State postconviction proceedings**

1.     **Hernandez's petition for postconviction relief**

Hernandez next filed a handwritten *pro se* motion for postconviction relief on July 25, 2006. (P.C. Ex. 2).  For reasons that will become obvious later, an extended discussion of the state-court record is required because of confusion as to whether Hernandez properly raised claims that his trial counsel was ineffective in not objecting on hearsay and Confrontation Clause grounds to testimony from two physicians regarding statements made by L.H. concerning prior sexual relations between Hernandez and L.H.

Hernandez subsequently filed two amendments to his state motion for postconviction relief, enlarging the grounds upon which relief was being sought.  (P.C. Exs. 6-7).  These amendments were prepared by jailhouse lawyers at the North Dakota State Penitentiary.[2]  What follows is this court's compilation of the grounds alleged in the original and amended motions with the numbering and wording of the claims being the court's, except with respect to Claim 1(F), which is quoted verbatim from Hernandez's handwritten petition:

1.     Ineffective Assistance of Counsel

     A.     Defense counsel failed to object to evidence that the victim had gonorrhea which was introduced in violation of N.D. R. Evid. 412.

     B.     Defense counsel made a motion in limine pursuant to N.D. R. Evid. 404(b) rather than N.D. R. Evid. 412.

     C.     Defense counsel failed to request a continuance to prepare a defense against the introduction of the gonorrhea evidence so that Counsel could have attempted to prove someone else was responsible for the victim's gonorrhea.

_____

[2]  The pleadings state they were prepared by "law clerk (R.S.)" at the North Dakota State Penitentiary. Hernandez later explained that they were prepared by a group of jailhouse lawyers, including Randall Steen.  (P.C. Ex. 18, pp. 15-16).

D.      Defense counsel failed to call the defense's handwriting expert as a witness.

E.      Defense counsel failed to object to prosecutorial misconduct which destroyed the presumption of innocence.

F.      "Counsel failed to lay foundation and object to the court's denial to put the alleged victim and mother witnesses on the stand for cross-examination on the critical and severely damaging evidence of the gohnorra [sic] and the 7 yrs of sexual abuse.  Defendant was prejudiced by not being allowed to show reasonable doubt of the truthfulness of the allegations that were only hearsay, but the jury accepted it as concrete evidence of guilt."

G.      Defense counsel failed to object to the admission of an unredacted translation of a letter purportedly authored by the defendant that contained references to uncharged past sexual contact between the defendant and L.H.

H.      Defense counsel failed to object to the State's questions about tests for sexually transmitted diseases.

I.      Defense counsel failed to preserve the search warrant issue in the motion for new trial.

2.      <u>Prosecutorial Misconduct</u>

A.      The prosecutor failed to give notice of Rule 412 evidence.

B.      The prosecutor destroyed the presumption of innocence in his closing argument.

C.      The prosecutor solicited improper testimony regarding past sexual abuse of L.H. by the defendant.

3.      <u>Denial of Fair Trial</u>

A.       Inadmissable evidence prejudiced the jury.

B.      Extraneous information was not weighed on whether or not it would affect the jury's decision.

4.      <u>Judicial Misconduct</u>

A.      The trial judge allowed the prosecutor to make improper arguments.

B.      The trial judge should have recused herself because she knew L.H.

5

**2.      The postconviction evidentiary hearing and briefs of the parties**

Hernandez also submitted an extensive brief in support of his motion for postconviction relief.  With respect to Claim 1(F), the brief contained an extensive argument as to why his counsel was ineffective in failing to object to the trial court not recalling L.H. for cross-examination, arguing that the physician testimony as to L.H.'s statements about prior sexual relations with Hernandez was inadmissible hearsay and violated the Confrontation Clause.  For support, it cited both Crawford v. Washington, 541 U.S. 36 (2004) and State v. Blue, 2006 ND 134, 717 N.W.2d 558, a North Dakota Supreme Court case applying Crawford.   (P.C. Ex. 8, pp. 17-20).

It is unclear why Hernandez in his *pro se* petition phrased his hearsay and Confrontation Clause claims of ineffective assistance in terms of trial counsel's failure "to lay foundation and object to the court's denial to put the alleged victim and mother witnesses on the stand for cross-examination" and why his initial brief, which was prepared by his jailhouse lawyers, similarly phrased the issue.  As discussed in more detail later, however, the State called L.H. as its first witness.  And, during the course of the trial, it is apparent from the record that the trial judge expressed her hope that L.H. would not be recalled by the parties when issues arose with respect to the admission of the evidence of the prior sexual relations.  (Ex. 25, pp. 300, 398-399).  It may be that Hernandez got the impression that the trial judge had ruled that L.H. could not be recalled, as opposed to simply indicating her preferences.[3]

---

[3]  During the state postconviction hearing, Hernandez's counsel testified that the decisions not to recall L.H. and her mother were tactical, but then went on to add:

> And . . . [L.H.], we were put on pretty clear notice, was not to come back before the jury.

(P.C. Ex. 18, p. 24).  Later, when asked again whether the decision not to recall L.H. was tactical, he stated:

> Yeah, a matter of trial strategy.  I don't know how many young people you've had to examine, but my view was that I wasn't going to call her back.  The Court had some discussion too.  I don't know if it is all in the record or not, about not having this little girl trot back in here to do anything.

(P.C. Ex. 18, p. 38)

An evidentiary hearing was held on November 16, 2006.  By the time of the hearing, the court had appointed an attorney to represent Hernandez, who was not his trial counsel.  During the hearing, Hernandez testified on his own behalf, and the State called Hernandez's trial counsel as well as a physician to discuss the incubation period for gonorrhea.  (P.C. Ex. 18).  Also, during the hearing, Hernandez waived his claims of denial of a fair trial and judicial misconduct, leaving only his claims of ineffective assistance and prosecutorial misconduct. (P.C. Ex.18, pp. 9-10).

The hearsay and Confrontation Clause arguments of ineffectiveness were raised during the hearing.  Hernandez complained about the lack of opportunity to cross-examine L.H. about the physician hearsay testimony.  (P.C. Ex. 18, pp. 12-13).  Further, his trial counsel was asked about whether he was familiar with Crawford and whether he had objected on hearsay and Confrontation Clause grounds to the physician testimony of L.H.'s statements about the prior sexual relations with Hernandez.  He testified that he was aware of Crawford and that the reason he did not object on hearsay and Confrontation Clause grounds was because he believed the testimony was admissible under the hearsay exception for statements made to a doctor for purposes of diagnosis and treatment. (P.C. Ex. 18, pp. 35-37).

During the posthearing briefing permitted by the trial court, Hernandez, who now had the assistance of counsel, more correctly phrased the claims of ineffective assistance with respect to the hearsay and Confrontation Clause arguments.  Hernandez's posthearing brief clarified that he was making two arguments:   The first was the failure of defense counsel to object to the physician testimony when it was first offered on hearsay and Confrontation Clause grounds.  The second was that trial counsel was ineffective in not calling L.H. and as part of the defense case if proper objections to the proffered hearsay had failed.  (P.C. Ex. 10, pp.  6-7).

The State clearly understood the two arguments that were being made.  With respect to the first claim, the State contended there was no ineffectiveness in failing to object to the physician testimony on hearsay and Confrontation Clause grounds.  The State argued that <u>Crawford</u> did not apply because L.H. had appeared as a witness and could have been called for cross-examination by the defense and also because her statements were not "testimonial" within the meaning of <u>Crawford</u>.  With respect to the failure to object on hearsay grounds, the State argued the testimony was admissible because it was made under the exception allowing statements made for medical diagnosis and treatment.  (P.C. Ex. 11, pp. 6-11).

With respect to the second claim, the State contended that counsel was not ineffective in failing to call L.H. as part of the defense case, arguing it was simply a matter of acceptable trial strategy.  Finally, with respect to both claims, the State argued that Hernandez had failed to prove prejudice.  (P.C. Ex. 11, pp. 6-11).

### 3.     The trial court's decision on the petition for postconviction relief

The trial court denied Hernandez's motion for postconviction relief  in a written opinion dated February 13, 2007.  (P.C. Ex. 15).  In the opinion, the court identified nine claims of ineffective assistance being asserted by Hernandez and gave a short explanation with respect to each as to why trial counsel's performance was not ineffective and then concluded, generally, that Hernandez had failed to prove prejudice.  (P.C. Ex. 15, pp. 2-7).  With respect to the claims of prosecutorial misconduct, the court concluded that the claims should have been raised during the direct appeal and dismissed them on grounds of misuse of process, citing <u>Laib v. State</u>, 2005 ND 187, ¶¶ 6-7, 705 N.W.2d 845 and N.D.C.C. § 29-32.1-12(2)(a).  (P.C. Ex. 15, p. 7).

In terms of the Hernandez' arguments of ineffectiveness in failing to object to the physician testimony on  hearsay and Confrontation Clause grounds, the trial court characterized the claim being made by Hernandez as follows:

> 6) Ineffective assistance of counsel - trial counsel "failed to object to the court not calling back witnesses to be cross-examined, specifically L.H. and Jennifer Haroldson.

(P.C. Ex. 15, p. 2)  Later, in addressing the merits of the claim, the court stated:

> Mr. Hernandez claims that Mr. Fisher was ineffective in that he failed to recall the victim's mother to cross examine them after the gonorrhea testimony. Mr. Fisher testified that he believed the jury had heard enough from the victim's mother. Tr. at 30.  He stated that she was a difficult witness for the prosecution and the defense because she was an advocate for the victim. Tr. at 30. Mr. Fisher stated that he chose not to recall the victim because of the pitfalls that can be associated with cross examining a witness of a relatively young age. Tr. at 25. Mr. Fisher felt she was a well-rehearsed witness and to recall her would not be productive. Tr. at 25. Mr. Fisher believed that it would be better to address any of these issues in closing than on re-cross. Tr. 26.

(P.C. Ex. 15, p. 5).  Notably, the trial court made no mention of the hearsay and Confrontation Clause issues that were discussed during the hearing and that were briefed by the parties.  As will be discussed later, this raises the question as to whether the trial court addressed these ineffective assistance arguments.

### 4.    The North Dakota Supreme Court summarily affirms the denial of the petition for postconviction relief

Hernandez next appealed the denial of his motion for postconviction relief to the North Dakota Supreme Court.  Another attorney was appointed to represent him on appeal.  Hernandez's brief on appeal raised the following claims:

1.    Ineffective Assistance of counsel based on the following:

    A.    Defense counsel improperly objected to past sexual history.

       B.      Defense counsel failed to object to hearsay testimony under <u>Crawford</u> from physicians testifying to what the victim had told them about prior uncharged sexual relations with the defendant.

       C.      Defense counsel failed to call the alleged victim and her mother as witnesses as part of the defense case.

       D.      Defense counsel "opened the door" allowing past sexual conduct into evidence.

       E.      Defense counsel failed to object to prosecutorial misconduct.

    2.      The District Court erroneously held that Hernandez failed to preserve his claims of prosecutorial misconduct.

Notably, both parties briefed the merits of the claims of ineffective assistance in failing to object to the physician testimony on hearsay and Confrontation Clause grounds, repeating, in large part, the arguments that had been made to the state district court.  (P.C. Exs. 19-21).

On June 26, 2007, the North Dakota Supreme Court summarily affirmed the trial court's denial of the petition for postconviction relief, stating the following:

> PER CURIAM.
>     [¶ 1] Luis I. Hernandez, Sr., appealed from a district court judgment denying his application for post-conviction relief. Hernandez argued that his trial counsel committed numerous errors which cumulatively caused him to receive ineffective assistance of counsel. Additionally, he argued that his claim of prosecutorial misconduct should not be barred for misuse of process. We conclude the district court properly denied Hernandez's application for post-conviction relief. We summarily affirm under N.D.R.App.P. 35.1(a)(2) and (7).  <u>See</u> <u>Laib v. State</u>, 2005 ND 187, ¶¶ 6-7, 705 N.W.2d 845 (holding that a claim of prosecutorial misconduct may be dismissed for misuse of process when the defendant has inexcusably failed to raise the issue in prior proceedings).

<u>Hernandez v. State</u>, 2007 ND 92, 734 N.W.2d 342.

## II.   **CLAIMS TO BE CONSIDERED**

Hernandez's filed his *pro se* § 2254 petition with this court on August 24, 2007.  (Doc. No. 1).  The petition includes six numbered claims of ineffective assistance of counsel, three claims of prosecutorial misconduct, and five other claims.  Notably, the claims of ineffective assistance of counsel are   the same as those set forth in Hernandez's original   state-court petition for postconvicton relief, including the ambiguously worded claim pursuant to which Hernandez argued his hearsay and Confrontation Clause arguments.  (Doc No. 1; P.C. Ex. 2).

After Respondent moved to dismiss, Hernandez filed a response in which he argues seventeen separately-numbered claims of ineffective assistance of counsel, as opposed to the six listed in his petition, and five claims of claims of prosecutorial misconduct, as opposed to the three listed in his petition.  (Doc. No. 13).  In the conclusion portion of his response, Hernandez requests that he be permitted to delete any claims that the court determines not to have been exhausted, so that he may be allowed to proceed on the exhausted claims.  He also requests that the court liberally construe his pleadings because of his *pro se* status and freely allow amendments.  (Doc. No. 13, pp. 11-12).

What makes the matter more confusing is that the claims listed in the response are worded differently and are not in the same order as in the petition.  Also, several of the claims appear to the duplicates of each other.

Respondent argues that the "additional" claims set forth in the response should not be considered because they were not set forth in the petition.  After careful review, it is clear that the "additional" claims, except for two which are discussed separately below, have not been exhausted.

Consequently, they need not be considered further because of the request that any unexhausted claims be deleted from consideration and because they were not included in the petition.

However, of the claims in the response that Respondent argues are new and should be excluded, there are two that were exhausted at the state-court level. One is the claim that counsel was ineffective on hearsay and Confrontation Clause grounds in failing to object to the physician testimony recounting  L.H.'s statements of prior sexual relations with Hernandez.

Arguably, this claim is already part of this proceeding. As noted above, Hernandez presented his hearsay and Confrontation Clause arguments to both the state district court and the North Dakota Supreme Court pursuant to the same ambiguous Claim 1(F) that is now item VI in his petition, and the State responded on the merits, rather than opposing the arguments on procedural ground.

Whether the court liberally construes Hernandez's *pro se* petition as including his hearsay and Confrontation Clause arguments or grants a formal amendment including the claim, the result is the same. However, to avoid unnecessary and continued arguments over whether this claim is properly before the court, the court grants an amendment to include the claim. Cf. Frey v. Schuetzle, 78 F.3d 359, 361-362 & n.2.

The other claim in question that was exhausted at the state-court level is the claim that defense counsel was ineffective because he "opened  the door" to the introduction of the evidence of the prior sexual relations by asking the doctor who performed the examination of L.H.  how long it would take to be able to test positive for gonorrhea.  While it may be more of a stretch to say this claim is included in the petition based simply on the wording of the claims, the claims of ineffectiveness in the petition are the exact same as those that were in Hernandez's state court petition.  And, when Hernandez argued his "opened the door" claim to the North Dakota Supreme

Court, the State did not argue the claim was not in his state-court petition and, instead, responded

on the merits.  Further, the "opened the door claim" is closely related to item I of the petition, which

is the claim that counsel was ineffective in failing to object to the introduction of the gonorrhea

evidence.  Given the circumstances, and particularly the fact that Hernandez is proceeding *pro se*,

the court will grant an amendment allowing this claim as well.

In allowing these amendments, Respondent suffers no prejudice.  As already observed, the

claims were addressed by the parties on the merits during the state-court proceedings and the State

did not object to them on procedural grounds.  And, in terms of this proceeding, Respondent has

addressed the merits of the claims in its reply and surreply briefs.

The net result is that the following claims will be considered.  The order and numbering are

the court's for its convenience.

1.  <u>Claims of error on the part of the trial court</u>

Claim 1(A)   The trial court erred in allowing the State's handwriting expert to testify.

Claim 1(B)   The trial court erred in permitting the State to introduce evidence regarding nonmotile sperm found on the victim which was not preserved for inspection by the defense.

Claim 1(C)   The trial court erred in allowing evidence of uncharged past sexual contact between Hernandez and L.H. over counsel's objections on relevancy grounds.

Claim 1(D)   The trial court erred in admitting into evidence an unredacted translation of a letter purportedly written by Hernandez, which Hernandez claimed contained references to uncharged past sexual contact between him and L.H.

2.  <u>Claims of Ineffective Assistance of Counsel</u>

Claim 2(A)   Defense counsel failed to object to evidence that the victim had gonorrhea.

13

Claim 2(B)    Defense counsel made a motion in limine pursuant to N.D. R. Evid. 404(b) rather than N.D. R. Evid. 412.

Claim 2(C)    Defense counsel failed to object to the physician testimony of L.H.'s statements of prior incidents of sexual abuse on hearsay and Confrontation Clause grounds.

Claim 2(D)    Defense counsel opened the door to the introduction of the prior uncharged conduct by inquiring about the incubation period for gonorrhea.

Claim 2(E)    Defense counsel failed to recall the victim and her mother for additional testimony regarding the source of the victim's gonorrhea.

Claim 2(F)    Defense counsel failed to request a continuance to prepare a defense against the introduction of the gonorrhea evidence, including attempting to prove someone else was responsible for the victim's gonorrhea.

Claim 2(G)    Defense counsel failed to call the defense's handwriting expert as a witness.

Claim 2(H)    Defense counsel failed to object to prosecutorial misconduct which destroyed the presumption of innocence.

3.    <u>Claims of prosecutorial misconduct</u>

Claim 3(A)    The prosecutor failed to give notice of Rule 412 evidence.

Claim 3(B)    The prosecutor destroyed the presumption of innocence in his closing argument.

Claim 3(C)    The prosecutor solicited improper testimony regarding past sexual abuse of the victim by the defendant.

4.    <u>Other claims</u>

Claim 4    The execution of a search warrant which required the defendant to give blood and DNA samples was fatally flawed.

III.   **GOVERNING LAW**

A.   **Scope of Review**

Under 28 U.S.C. § 2254, a federal court may review state-court criminal proceedings to determine whether a person is being held in violation of the United States Constitution or other federal law.  In most cases, this review is limited because, as a matter of federalism and comity, the primary responsibility for ensuring compliance with federal law in state-court criminal proceedings rests with the state courts.

In keeping with this policy, § 2254(d) limits federal-court review when the state courts have addressed the federal claims on the merits to instances when a person is being held in custody pursuant to a state-court decision that (1) is directly contrary to established federal law as enunciated by the United States Supreme Court, (2) is an objectively unreasonable application of Supreme Court precedent, or (3) is based on an unreasonable determination of the facts based on the evidence presented in the state-court proceeding.  See 28 U.S.C. § 2254(d); see generally Woodford v. Visciotti, 537 U.S. 19, 26-27 (2002 (per curiam); Williams v. Taylor, 529 U.S. 362, 399-413 (2000); Williams v. Taylor, 529 U.S. 420, 436-437 (2000).[4]  This highly deferential standard of review under

---

[4] The Supreme Court has held that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning and has described the differences as follows:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  Id., at 405-406, 120 S.Ct. 1495. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  Id., at 407-408, 120 S.Ct. 1495. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one.  Id., at 409- 410, 120 S.Ct. 1495. See also id., at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

Bell v. Cone, 535 U.S. 685, 694 (2002); see also Early v. Packer, 537 U.S. 3, 7-11 (2002) (per curiam).

§ 2254(d) is often referred to as "AEDPA deference" because it was enacted by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). E.g. Pederson v. Fabian, 491 F.3d 816, 824-825 (8th Cir. 2007).

Also, in keeping with the policy of placing primary responsibility for the enforcement of federal rights upon the state courts, § 2254 imposes a number of additional rules and procedures to limit federal-court "retrials" of state-court criminal proceedings under the guise of federal habeas corpus. See Bell v. Cone, 535 U.S. 685, 693 (2003). Subdivisions (b) & (c) impose the long-standing requirement that federal courts may only consider habeas claims that have first been exhausted using available state-law procedures. Subdivision (e)(2) requires that the petitioner develop the factual bases for the federal claims in the state-court proceedings by limiting the availability of federal evidentiary hearings to those situations in which the federal claims rely upon a new, retroactive law or are based on facts that could not have been previously discovered by the exercise of due diligence. Finally, subdivision (e)(1) provides that state-court factual findings carry a presumption of correctness, which can only be rebutted by clear and convincing evidence.

### B.     Exhaustion requirements

It is well established that the exhaustion doctrine, codified at 28 U.S.C. §§ 2254(b)-(c), precludes granting habeas relief with respect to a claim for which state-court remedies have not been properly exhausted. E.g., Rhines v. Weber, 544 U.S. 269, 274 (2005); Dixon v. Dormire, 263 F.3d 774, 777 (8th Cir. 2001). Proper exhaustion has two components: First, the claim must be "fairly presented," either by referring to the particular federal constitutional right or citing to a state or federal case that raises the pertinent constitutional issue. Cox v. Burger, 398 F.3d 1025, 1031 (8th Cir. 2005); Gentry v. Lansdown, 175 F.3d 1082, 1083 (8th Cir. 1999) ("A petitioner meets the fair

presentation requirement if the state court rules on the merits of his claims, or if he presents his claims in a manner that entitles him to a ruling on the merits.").  Second,  the petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addition, there are three other aspects of the exhaustion doctrine that should be mentioned. The first is that the exhaustion doctrine is satisfied if there are no state-court remedies available and exhaustion would be futile.  E.g., Armstrong v. Iowa, 418 F.3d 924, 926-927 (8th Cir. 2005).  The second is that Rose v. Lundy, 455 U.S. 509 (1982) prohibits a petitioner from proceeding with a "mixed petition" of exhausted and unexhausted claims.  See also Rhines v. Weber, 544 U.S.  at 273-274.   The  third  is  that  § 2254(b)(2)  authorizes  the  court  to  deny  a  claim  on  the  merits notwithstanding a failure to exhaust.  E.g., Gringas v. Weber, 543 F.3d 1001,  2008 WL 4489678, *2 (8th Cir. 2008).

### C.    Procedural default

A federal district court is precluded from substantively considering a habeas claim that has been procedurally defaulted at the state level on independent and adequate state grounds.  E.g., Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  State procedural grounds are independent and adequate if they are firmly established, readily ascertainable, and regularly followed.  Barnett v. Roper, 541 F.3d 804, 808 (8th Cir. 2008); Franklin v. Luebbers, 494 F.3d 744, 750 (8th Cir. 2007). They must also further a legitimate state interest and not be applied in an exorbitant manner. Barnett, supra.

The rule barring procedurally-defaulted claims is nearly absolute. <u>Cagle v. Norris</u>, 474 F.3d 1090, 1099 (8th Cir. 2007).   The only exceptions are the rare instances when a prisoner is able to meet the strict cause and prejudice or actual innocence standards.  <u>E.g.</u>, <u>Dretke v. Haley</u>, 541 U.S. 386, 392-393 (2004); <u>id</u>.

## IV.    THRESHOLD DEFENSES

Respondent argues that Hernandez has failed to exhaust a number of the claims of ineffective assistance that the court has included in the final list for consideration.  In addition, Respondent argues that several other claims are barred because they have been procedurally defaulted.  These defenses will be addressed first.

### A.    Claim 2(A) has been exhausted

 Respondent contends that Claim 2(A), failure to object to the introduction of the gonorrhea evidence, has not been exhausted, arguing that the issue was raised at the state district court level, but not on appeal to the North Dakota Supreme Court.  A review of the state-court pleadings, however, indicates that the issue was presented on appeal, although, perhaps, framed somewhat differently than as before the district court.  (P.C. Ex. 19, pp. 5-7).  Claim 2(A) has been exhausted.

### B.    Claims 2(F), 2(G), 2(H) may not have been properly exhausted, but will be addressed on the merits

Claim 2(F), failure to request a continuance to prepare a defense against the gonorrhea evidence, and Claim 2(G), failure to call the defense's handwriting expert, were argued by Hernandez to the state district court and addressed on the merits in the court's memorandum decision.  (P.C. Ex. 8, pp. 11-13; P.C. Ex. 15, pp. 4-5).  Respondent argues that they were not fairly presented on appeal because they were only mentioned in the "Statement of Facts" portion of Hernandez's appeal brief and not separately argued in the merits portion of the brief.

18

In Claim 2(H), Hernandez argues that his attorney was ineffective in failing to object to an analogy used by the prosecutor during final argument to illustrate the presumption of innocence, claiming it amounted to prosecutorial misconduct.  Hernandez also asserts Claim 3(B) arguing prosecutorial misconduct based upon the same analogy.

During the state postconviction proceedings, Hernandez argued both the claim of prosecutorial misconduct and the corresponding claim of ineffectiveness based on the allegedly improper analogy.  (P.C. Ex. 8, pp. 14-17; P.C. Ex. 15, p. 5).  The state district court denied the claim of ineffectiveness on the merits and dismissed the direct claim of prosecutorial misconduct on procedural grounds.  (P.C. Ex. 15).

On appeal to the North Dakota Supreme Court, Hernandez again made a claim of ineffective assistance for failure to object to statements made by the prosecutor during final argument.  This time, however, he pointed to other statements made by the prosecutor and not to the analogy used to illustrate the presumption of innocence.  (P.C. Ex. 19, pp. 10-11). He did, however, continue to assert the related direct claim of prosecutorial misconduct and noted in passing that his counsel had failed to object to the allegedly improper analogy.  (P.C. Ex. 19, p. 13).  Respondent argues that this did not amount to fair presentation of his ineffective assistance claim for failing to object to the analogy.

Respondent's objections that Claims 2(F), 2(G) and 2(H) have not been properly exhausted may have merit.  Nevertheless, the claims will be addressed on the merits pursuant to the authority granted by 28 U.S.C. § 2254(b)(2).[5]

---

[5]  If these claims were not fairly presented on appeal, they have also been procedurally defaulted.  This is because the failure to properly pursue a claim on appeal is deemed an abandonment of the claim under North Dakota law.  E.g., Berlin v. State, 2000 ND 437, ¶7, 604 N.W.2d 437  (holding in an appeal from a denial of postconviction relief that issues not briefed are deemed  abandoned).  And, once abandoned, the claim cannot be  be represented. E.g.,

C.     **Claims 3(A)-3(C) arguing prosecutorial misconduct have been procedurally defaulted**

The allegations of prosecutorial misconduct comprising Claims 3(A) - 3(C) were raised for the first time by Hernandez in his state court petition for  postconviction relief.  The trial court, citing  Laib v. State, 2005 ND 187, 705 N.W.2d 845, denied the claims on the grounds of misuse of process because Hernandez had failed to raise them earlier in his direct appeal.  On appeal, the North Dakota Supreme Court summarily affirmed and also cited Laib.  Hernandez v. State, 2007 ND 92 at ¶ 1.

In Laib, the North Dakota Supreme Court held that N.D.C.C. § 29-32.1-12(2)(a) barred a prisoner from raising claims of prosecutorial misconduct for the first time in a petition for postconviction relief when they could have been asserted on direct appeal.  Laib, 2005 ND 187, at ¶¶ 5-7.  And, as noted by the cases cited in Laib, the North Dakota Supreme Court has consistently enforced the procedural bar set forth in § 29-32.1-12(2)(a).  See, e.g.,  Laib, 2005 ND 187, at ¶ 6.  Consequently, Claims 3(A)-3(C) are subject to dismissal on the grounds that they have been procedurally defaulted.

In an attempt to save these claims, Hernandez argues "cause and prejudice" and also that he is actually innocent.  For cause, he points to his trial attorney's failure to object to the prosecutorial misconduct at trial and his failure to raise the issues on direct appeal.  The exhaustion doctrine requires, however, that any claim of ineffectiveness that is used to establish "cause" must first have been presented to the state-courts as an independent claim.  Taylor v. Bowersox, 329 F.3d 963, 971 (8th Cir. 2003).

---

Steen v. State, 2007 ND 123, ¶13, 737 N.W.2d 457 (2007); N.D.C.C. § 29-32.1-12(2).

In this case, while Hernandez did not present to the state courts separate claims of ineffectiveness with respect to the alleged prosecutorial misconduct that is the subject of Claims 3(A) and 3(C), he did assert on direct appeal a related claim of error on the trial court in admitting the prior bad acts evidence (Claim 1(C)) and  related claims of ineffectiveness that  focused on his trial counsel's performance (Claims 2(A), 2(B) & 2(D)).   Those claims lack merit for the reason discussed elsewhere.  With respect to Claim 3(B), Hernandez did raise a claim of ineffectiveness based on his attorney not objecting at trial to the alleged improper analogy that was characterized as being prosecutorial misconduct.  While there is some question whether that claim was abandoned on appeal, it does not make any difference since the claim lacks  merit for the reasons discussed below. (See discussion Claim 2(H) *infra*).  Consequently, Hernandez has failed to demonstrate "cause and prejudice." <u>See</u>, <u>e.g.</u>, <u>Clemons v Luebbers</u>, 381 F.3d 744, 750-753 (8th Cir. 2004) <u>Taylor v. Bowersox</u>, <u>supra</u>.

Hernandez also makes a bald assertion of actual innocence, but has failed to present any new evidence that was not available at the time of the trial. <u>See</u>, <u>e.g.</u>, <u>Osborne v. Purkett</u>, 411 F.3d 911, 920-921 (8th Cir. 2005). Further, for the reasons discussed later, the evidence presented at trial overwhelming supports a finding of guilt.  Consequently, Hernandez has failed to demonstrate actual innocence.

Based on the foregoing, Claims 3(A)-3(C) should be denied on the grounds that they have been  inexcusably procedurally defaulted.

### D.    Claim 4 has been procedurally defaulted

In Claim 4, Hernandez agues that a state court's order directing a hospital to take samples from him for DNA testing, which supplemented an earlier search warrant, was defective.  This claim

was raised on direct appeal, but the North Dakota Supreme Court refused to address it because Hernandez had failed to raise the issue in his motion for new trial. <u>Hernandez</u>, 2005 ND 214 at ¶33. The court explained that, when a defendant brings a motion for new trial after being convicted, he is limited on appeal to the grounds raised in the motion for new trial. <u>Id.</u> This procedural bar is well-established and has been consistently applied by the North Dakota Supreme Court. <u>See</u> <u>State v. Jordheim</u>, 508 N.W.2d 878, 880-81 (N.D. 1993) (citing other cases). Consequently, Claim 4 has been procedurally defaulted. Also, it need not be considered further since Hernandez has not asserted a "cause and prejudice" argument with respect to this claim and none would be warranted.

V.   **CLAIMS OF ERROR ON THE PART OF THE TRIAL COURT**

The claims raised by Hernandez as part of his direct appeal will be considered first. Since the North Dakota Supreme Court addressed these claims on the merits, the court will look to its decision to determine if its treatment of the claims was (1) directly contrary to established federal law as enunciated by the United States Supreme Court, (2) an objectively unreasonable application of Supreme Court precedent, or (3) based on an unreasonable determination of the facts based on the evidence presented in the state-court proceeding. <u>Mark v. Ault</u>, 498 F.3d 775, 783 (8th Cir. 2007) ("we apply the AEDPA standard to the . . . 'last reasoned decision' of the state courts").

A.   **Claim 1(A) - allowing the State's handwriting expert to testify**

Hernandez contends that the trial court erred by allowing the State's handwriting expert to testify without conducting any "gatekeeping" function, arguing that <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999) governed the admissibility of the expert testimony. He also argues that the handwriting expert was

not qualified and that his testimony amounted to "junk science," resulting in an unfair trial and a

violation of his Fourteenth Amendment rights to due process.

The North Dakota Supreme Court declined Hernandez's invitation to adopt <u>Daubert</u> and

reiterated its adherence to N.D. R. Evid. 702 with regard to the admission of expert testimony.

<u>Hernandez</u>, 2005 ND 214, at ¶ 6.  Hernandez argues, nevertheless, that <u>Daubert</u> takes precedence.

This is not the case, however.  As noted by the Eighth Circuit in <u>Kinder v. Bowersox</u>, 272 F.3d 532

(8th Cir. 2001):

> "<u>Daubert</u> is an exegesis of Rule 702 of the Federal Rules of Evidence and governs
> the admission of expert evidence in federal trials only.  <u>Daubert</u> does not bind the
> states, which are free to formulate their own rules of evidence subject only to the
> limits imposed by the Constitution.

<u>Id.</u> at 545 & n.9.

As for the remainder of Hernandez's arguments, federal habeas relief is not available to

correct errors of state law.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(d).

It is only when a state court's evidentiary ruling infringes upon a specific federal constitutional

protection or is so prejudicial that it amounts to a denial of due process that federal habeas relief

becomes available.  <u>E.g.</u>, <u>Dowling v. United States</u>, 493 U.S. 342, 352-353 (1990) (evidentiary

infractions that would violate the Due Process Clause are few since it protects only against the

"introduction of . . . evidence [that] is so extremely unfair that its admission violates 'fundamental

conceptions of justice.'"); <u>Abdi v. Hatch</u>, 450 F.3d 334, 338 (8th Cir. 2006); see <u>Chambers v.</u>

<u>Mississippi</u>, 410 U.S. 284 (1979).

While the North Dakota Supreme Court did not explicitly address the due process issue, it

did explain why it disagreed with Hernandez's arguments that the State's handwriting expert was

unqualified and that his opinion amounted to "junk science." The court noted that it  had previously

recognized the validity of expert testimony about handwriting.  Hernandez, 2005 ND 214 at ¶ 9.

And, with respect to the expert's qualifications, the court noted his formal training and his prior

experience, which included handwriting analysis in over 100 cases and 30 years of work with the

North Dakota Bureau of Criminal Investigation.  Id.  Based on these points, the court concluded that

the trial court did not abuse its discretion in determining that the expert was qualified and that his

testimony would assist the jury.  Id.

Based on a careful review of the record, the North Dakota Supreme Court's findings and

conclusions are well-supported.  Further, Hernandez's counsel conducted a thorough and vigorous

cross-examination. (Ex. 25, pp. 498-508, 512, 515).  Consequently, the admission of the expert

testimony did not result in fundamental unfairness, and no violation of due process occurred.

In an event, Hernandez has failed to demonstrate that the result reached by the North Dakota

Supreme Court with respect to this issue is directly contrary to established federal law as enunciated

by the United States Supreme Court.  Claim 1(A) should be denied on the merits.

**B.      Claim 1(B) - permitting the State to introduce the results of a forensic
         evaluation when the evidence was not preserved for inspection**

L.H. was taken by her mother to a local hospital for examination on the same day of the

alleged assault.  The North Dakota Supreme Court found that the following facts with respect to the

gathering of the forensic evidence from that examination:

> [¶ 27] A sexual assault kit was performed on the complainant by MeritCare
> personnel on May 22, 2003. According to MeritCare personnel, after "debris"
> collected for the sexual assault kit was gathered and the sexual assault kit had been
> completed, Dr. Jacob noted dry secretions on the complainant and Dr. Jacob
> collected a swab from the complainant under MeritCare's internal procedures in
> sexual assault cases. According to MeritCare personnel, the swab was in addition to
> the usual sexual assault kit. The swab was taken to MeritCare's lab for testing, and
> a MeritCare technician found non-motile sperm. After that test, the technician
> destroyed the sample.

Hernandez, 2005 ND 214 at ¶ 27.  The only additional relevant facts are that the forensic evidence forwarded to the state lab did not indicate the presence of sperm and that  various explanations were offered for why sperm were found in the discarded swab and not in the evidence forwarded to the state lab.

On appeal to the North Dakota Supreme Court, Hernandez argued that the trial court erred in admitting the evidence from the discarded swab in violation of N.D. R. Evid. 403.  He also argued that his due process rights had been violated, citing to California v. Trombetta, 467 U.S. 479 (1984). Hernandez, 2005 ND 214 at ¶ 28.

When a state fails to preserve evidentiary material, of which no more can be said other than it could have been subjected to tests that may or may not have exonerated the defendant, the defendant must show bad faith on the part of the state in order to prove a denial of due process. Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988); Trevino v. Dahm, 2 F.3d 829, 832 (8th Cir. 1993); see also California v. Trombetta, supra.  In Youngblood, the police refrigerated a sexual assault kit but did not refrigerate the victim's clothing, which were later found to have semen stains. 488 U.S. at 54.  The lower courts concluded that properly preserved semen samples could have produced results which might have exonerated the defendant and consequently reversed the defendant's conviction. Id. at 54-55.  The Supreme Court reversed, holding that the failure of the police to preserve the potentially useful semen evidence did not constitute a denial of due process since bad faith had not been demonstrated. Id. at 57-59.

In addressing this issue, the  North Dakota Supreme Court concluded:

[¶ 32] In State v. Steffes, 500 N.W.2d 608, 613 (N.D.1993), this Court defined bad faith, as used in cases involving destroyed evidence, to mean the evidence was deliberately destroyed by or at the direction of a State agent who intended to thwart and to deprive the defense of information.  Hernandez has not

25

> marshaled any evidence to show bad faith by the State. See <u>Steffes</u>, at 613-14.
> Moreover, "the possibility that the semen samples could have exculpated
> [Hernandez] if preserved or tested is not enough to satisfy the standard of
> constitutional materiality in <u>Trombetta.</u>" <u>Youngblood</u>, 488 U.S. at 56, 109 S.Ct. 333.
> We reject Hernandez's due process argument.

<u>Hernandez</u>, 2005 ND 214 at ¶ 32.  In addition to rejecting the due process argument, the court went

on to conclude that the trial court did not error in admitting the results of the forensic analysis of the

discarded swab in light of N.D. R. Evid. 403.  <u>Id.</u> at ¶¶ 29-32.

　　With respect to Claim (1)(B), the record supports the facts relied upon by the North Dakota

Supreme Court.  Further, the court correctly identified and applied controlling United States

Supreme Court precedent in concluding there was no due process violation.  Claim 1(B) should be

denied on the merits.

### C.　　Claim 1(C) - the trial court erred in allowing evidence of uncharged past sexual contact between the victim and the defendant.

　　During the trial, two physicians were permitted to testify that L.H. had told them that she had

been sexually abused by Hernandez on a number of prior occasions that were not included in the

single count of rape charged by the State, including testimony by one of the physicians that the acts

of prior sexual abuse dated back some seven years.  Prior to trial, Hernandez's counsel had filed a

motion in limine seeking to exclude the evidence on relevancy grounds under N.D. R. Evid. 404(b),

which motion was conditionally granted by the court.  During trial, however, the court ruled that

Hernandez's counsel had "opened the door" to the evidence and permitted the doctors to testify to

what they had been told by L.H., over continuing objections and motions for a mistrial by defense

counsel.[6]  The North Dakota Supreme Court made the following findings with respect to this claim:

---

[6]  A more detailed recitation of the facts is set forth *infra* in connection with Claim 2(C).

[¶ 16] Hernandez argues the trial court erred in allowing two pediatricians to testify that the complainant reported she had been sexually abused by Hernandez on numerous occasions over the previous seven years. The trial court initially granted Hernandez's motion in limine to suppress testimony about specific incidences of prior sexual misconduct by him against the complainant. At trial, an emergency room pediatrician, Dr. Anila Jacob, testified on direct examination by the State that she tested the complainant for sexually transmitted diseases on May 22, 2003, and the complainant tested positive for gonorrhea. On cross-examination by Hernandez, Dr. Jacob testified it takes about five days after a person has been exposed to gonorrhea to become infected. On re-examination by the State, Dr. Jacob testified the complainant reported she had been sexually abused by Hernandez on numerous occasions over the past seven years and had been sexually abused by Hernandez about a week before May 22. The State also elicited testimony from Dr. Alonna Norberg, a pediatrician who examined the complainant about six days after the May 22 examination. Dr. Norberg testified the complainant reported she had been sexually assaulted by Hernandez one week before May 22 and there had been other prior assaults by him.

* * * *

[¶ 22]  Here, issues about opening the door for evidence about Hernandez's prior sexual misconduct against the complainant initially arose during the testimony of both the complainant and the complainant's mother. During cross-examination of the complainant, defense counsel indicated the complainant had not called her mother after the May 22, 2003, incident. Outside the presence of the jury, the trial court indicated defense counsel had opened the door for the State to ask why the complainant had not called her mother and for the complainant to respond that she had not planned on telling her mother this had been going on for several years. The complainant subsequently testified she did not call her mother after the May 22, 2003, incident, because she did not plan on telling her mother she had been raped. During cross-examination of the complainant's mother, defense counsel asked her if Hernandez had always treated the complainant with respect before May 22, 2003, and the complainant's mother responded "not exactly." After a discussion outside the presence of the jury, the court allowed defense counsel to withdraw that question and response, but the court admonished counsel "one more time, if there's anything that gets remotely close to opening this door that is partway open now, I'm going to take the prosecutor's position on this." Thereafter, the jury heard testimony that the complainant tested positive for gonorrhea and the incubation period for gonorrhea was five days. When the State asked the emergency room pediatrician, Dr. Jacob, about the complainant's history, the court said it would allow the State a "reasonable opportunity to rebut [the] implication" the complainant had some other kind of sexual activity that caused the gonorrhea. The State thereafter elicited Dr. Jacob's testimony that the complainant reported she had been sexually abused by Hernandez on numerous occasions over the past seven years and most recently about a week

27

before May 22. The State subsequently elicited Dr. Norberg's testimony that the complainant reported she had been sexually assaulted by Hernandez one week before May 22 and there had been other prior assaults by him.

[¶ 23] In the context of the proceedings in this case, we conclude the trial court's determination that Hernandez had opened the door for limited testimony about his prior sexual misconduct against the complainant was the product of a rational mental process leading to a reasoned decision and was not an abuse of discretion. In response to testimony about the five-day incubation period for gonorrhea, the trial court limited the State to a "reasonable opportunity to rebut [the] implication" the complainant had some other kind of sexual activity that caused the gonorrhea. The pediatricians' testimony about prior sexual assaults by Hernandez, with the most recent assault about one week before May 22, was within the parameters of the door opened by Hernandez. Although the reference to assaults over the previous seven years may have stretched the temporal limits of the opened door, we are not persuaded any possible error in that limited reference to seven years was reversible error. The trial court instructed the jury about the use of that evidence:

> The State of North Dakota charged this defendant with Gross Sexual Imposition occurring on or about May 22, 2003, for a specific occurrence between the defendant and [the complainant]. [The complainant] did not testify about any other past incidents that occurred with this defendant.
>
> However, pursuant to certain questions asked of Dr. Anila Jacob, and her answers, the question arose as to how [the complainant] acquired gonorrhea, which takes five days to incubate. In order to present one possible explanation as to how [the complainant] acquired gonorrhea, Dr. Anila Jacob and Dr. Alonna Norberg were allowed to testify as to the medical history provided to them by [the complainant]. The testimony of Dr. Jacob and Dr. Norberg was offered for this specific purpose only. This testimony should not be considered by you in your determination of the ultimate fact as to whether or not the defendant is guilty of the crime charged in the Information on the date in question, May 22, 2003.

Hernandez, 2005 ND 214 at ¶¶ 16, 22-23.

Based on these findings, which are supported by the record, the North Dakota Supreme Court resolved the claim of trial error on state-law grounds. The court concluded that the trial court had not abused its discretion in allowing the disputed testimony in response to the defense counsel

having "opened the door" to the evidence. The court also concluded that there was no reversible error in any event given the court's curative instruction. Hernandez, 2005 ND 214 at ¶ 25.

As noted previously, federal habeas relief is not available to correct evidentiary errors under state law. It is only when the evidentiary ruling of the state court infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process that federal habeas relief becomes available.

Hernandez has not cited, nor is the court aware of, any precedent of the United States Supreme Court holding that the admission of evidence of prior incidents of sexual relations violates due process under the circumstances presented in this case, putting aside any questions of hearsay and confrontation rights, which were not issues at trial or on direct appeal and which are addressed later as part of the claims of ineffective assistance of counsel. The simple fact that the introduction of the evidence may have violated North Dakota's Rule 404(b) does not mean that a constitutional violation has occurred since this rule provides greater protections than that provided by the Constitution. Cf. Dowling v. United States, 493 U.S. at 352-54 (the admission of evidence in violation of Fed. R. Evid. 404(b) held not to violate the defendant's right to due process); United States v. Fell, 360 F.3d 135, 144 -145 (2d Cir. 2004). In fact, if this case had been tried in the North Dakota federal district court, the evidence of the prior sexual relations between the defendant and L.H. would likely have been admissible under Fed. R. Evid. 413 and 414 and not held to be a violation of due process rights. E.g., United States v. Medicine Horn, 447 F.3d 620, 622-623 (8th Cir. 2006) (rejecting a due process challenge to the admission of evidence of prior sexual assaults under Rule 413); United States v. Gabe, 237 F.3d 954, 959-960 (8th Cir. 2001). This is true even

with respect to the evidence that the prior acts of abuse took place over a seven year time period.

Id.

In summary, Hernandez has failed to demonstrate that the result reached by the North Dakota Supreme Court with respect to this issue is contrary to any controlling United States Supreme Court precedent. Further, for the reasons discussed later with respect to Claim 2(C), the admission of the prior acts evidence was harmless under the standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See also Toua Hong Chang v. Minnesota, 521 F.3d 828, 832 (8th Cir. 2008). Claim 1(C) should be denied on the merits.

### D.      Claim 1(D) - admission of an unredacted translation of a letter

During the trial, the State introduced an English language translation of an unsigned letter written in Spanish (or perhaps more appropriately "Tex-Mex") that L.H.'s mother found inside the screen door to her home. The State's handwriting expert testified the original was written by Hernandez, which Hernandez disputed.

Hernandez argues in Claim 1(D) that the State failed to abide by an agreement to redact the letter to exclude references to uncharged sexual misconduct. The North Dakota Supreme Court quoted the following portion of the letter as being specifically cited by Hernandez:

> *Do you remember when she went with me before that in the red truck and she came back with a smile from ear to ear because that day she was able to get it off twice and she was really happy. If I had raped her she wouldn't have been happy when I left her at the house. She would have been mad and she would have told you that I raped her but I didn't rape her she just put out willingly. She should say that we had sex not that I raped her.* And if they ask you if you want to press charges say no. My lawyer wants me to tell the court that you were seeing me after the charges. And already checked the hotels where we were seeing each other and that you had the yellow car then I gave you the truck because a lot of people saw me in the truck but if I tell them that Child Protection will take the children away from you I don't want that. You *better tell her that it was really voluntary sex not rape and you shouldn't press charges because if you don't do it they want to give me 20 years 15 at least.*

> And if I say that you were seeing me I could do less and that you were my accomplice they can lock you up too because you didn't call the police on me. I don't want that to happen. Take care of it between you and her.

Hernandez, 2005 ND 214 at ¶ 10 (italics in original).

In addressing this issue, the North Dakota Supreme Court found that, while several other letters and documents were the subject of a redaction agreement, the document in question was not and that Hernandez's counsel stated he had no objection to it when it was offered.  Id. at ¶ 11.  After making these findings, which are reasonably supported by the record, the court concluded that Hernandez was entitled to relief only if the claimed error on the part of the trial court amounted to plain error affecting substantial rights because of counsel's failure to object. Id. at 13.

In analyzing the claim under the plain error standard, the court went on to conclude that Hernandez's substantial rights were not affected, stating the following:

> [¶ 14] The context of the English translation of the Spanish letter indicates the letter was intended for the complainant's mother and referred to the immediate circumstances culminating in this criminal charge against Hernandez. The interpreter's note for the English translation of the letter indicates the Spanish version of the letter was notable for its lack of punctuation, incorrect spelling, and illegible handwriting. Immediately before the part of the letter cited by Hernandez, the letter provides:
>> The day of Court I got a letter making fun of me like always that I am here because of you and that I am here for this and for that, If all of you give me the opportunity I want to do things right where I did things wrong I don't want to live the way I am living I want things to be like they were when I got out of jail the last time. And for the two of us to get ahead. But for that to happen she has to tell the truth, that she went to the hotel with me and we had sex and that I didn't rape her. She told me to come up I told her that I couldn't she went up but she couldn't get it off by herself and that I should come up but when I went up my right hand was hurting and it went to sleep on me She got mad and tried to throw me to one side and I fell on top of her and I hit her in the face with the (illegible) She got mad, I told her that we couldn't do it anymore She even told me that she wanted (illegible) we were going to stop. She made fun of me and told me that after the accident I was not good for sex anymore. I told her that I wanted to

tell you and she told me that I had better not ever tell you because you were not going to believe me I told her that even so I was going to tell you when we got to the house She was mad and scared that I was going to tell you about the sex.

She went and told you and the police She told me on the way that if I told you she was going to kill herself. That you were going to believe me but (illegible) her instead because blood is thicker than water and that is what happened. You caught her talking on the telephone and you heard her telling me that blood is thicker than water that you were not going to believe me just her But what were you going to believe if I didn't tell you any thing. That is why I think she was mad about what happened in the room and what I told her that I was going to tell you She got scared of what you were going to say that is why she said what she said. I don't deny that I got involved with her but she gave it to me voluntarily.

[¶ 15] Although the language about "remember[ing] when she went with me before that in the red truck" suggests prior acts, the context of the entire letter indicates Hernandez was discussing the circumstances of the conduct charged in this action. The letter states Hernandez's belief that the twelve-year-old complainant voluntarily engaged in sexual relations with him. Section 12.1-20-03, N.D.C.C., makes it a crime to have sexual contact with a person who is less than 15 years old regardless of consent. See State v. Schill, 406 N.W.2d 660 (N.D.1987). In the context of the English translation of the entire letter, we conclude Hernandez has not demonstrated that any error in failing to ensure redaction of the language cited by him affected his substantial rights, or that correcting any such error would preserve the fairness, integrity, or public reputation of judicial proceedings. We therefore conclude Hernandez has failed to show obvious error under N.D.R.Crim.P. 52(b).

Hernandez, 2005 ND 214 at ¶¶ 14-15.

Hernandez argues that admission of the letter disclosing the prior uncharged conduct resulted in fatal prejudice, but does not make reference to any specific provision of the federal constitution that he claims was violated.  As noted previously, federal habeas relief is not available to cure errors of state law, and the only possible constitutional claim would be that the admission of the unredacted letter amounted to a denial of due process.

After careful review, it is clear that the admission of the unredacted letter did not result in a denial of due process, even if it disclosed the prior uncharged acts.  As discussed in the prior section, the admission of the prior bad acts evidence did not violate due process and the same reasoning applies to this claim.

In summary, Hernandez has failed to demonstrate a constitutional violation that would entitle him to habeas relief, much less that the result reached by the North Dakota Supreme Court is contrary to clearly established federal law as determined by the United States Supreme Court.  Also, any admission of the prior bad acts evidence by way of the unredacted  letter was harmless for the reasons discussed with respect to the prior claim and later with respect to Claim 2(C).  Consequently, Claim 1(D) should be denied on the merits.

## VI.    CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

The North Dakota Supreme Court summarily affirmed the state district court's denial of the claims of ineffective assistance of counsel raised by Hernandez in his state postconviction relief proceedings.   This makes the district court's memorandum opinion the last reasoned state-court decision for purposes of applying AEDPA's standards.  Mark v. Ault, supra.

### A.     Law governing claims of ineffective assistance

Under  Strickland v. Washington, 466 U.S. 668 (1984), a defendant who claims ineffectiveness of counsel must ordinarily demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defendant.[7]  The test for deficient performance

---

[7]  There are three situations in which a Sixth Amendment violation may be presumed without consideration of the "performance" and "prejudice" components of Strickland: (1) when the accused is actually or constructively denied counsel during a critical stage of the criminal proceeding, (2) when counsel fails to subject the government's case to a meaningful adversarial testing, which failure must be complete and not limited to isolated portions of the proceeding, or (3) when circumstances are present that even competent counsel could not render effective assistance.  E.g., Bell v. Cone, 535 U.S. at 695-697; United States v. White, 341 F.3d 673, 677-679 (8th Cir. 2003).  None are applicable here.

under the "first Strickland prong" is whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Id. at 688; Rompilla v. Beard, 545 U.S. 374, 380 (2005); Pfau v. Ault, 409 F.3d 933, 939 (8th Cir. 2005). In making this determination, a state or federal court must:

> ". . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. *Id.* at 689, 104 S.Ct. at 2065.

Nave v. Delo, 62 F.3d 1024, 1035 ( 8th Cir. 1995). When the issue involves a matter of trial strategy, there is a strong presumption that the strategy was sound and does not amount to ineffective assistance. Bell v. Cone, 535 U.S. at 698; Williams v. Bowersox, 340 F.3d 667, 672 (8th Cir. 2003). Likewise, the same holds true in judging trial counsel's performance with respect to claims of inadequate investigation. Rompilla v. Beard, 545 U.S. at 380-381 ("In judging the defense's investigation . . . hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made . . . and by giving a 'heavy measure of deference to counsel's judgments.'") (quoting Strickland , 466 U.S. at 689 & 691).

Under the "second Strickland prong," prejudice is only shown when "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." E.g., Woodford v. Visciotti, 537 U.S. at 22 (quoting Strickland, 466 U.S. at 694 and adding emphasis); Perry v. Kemna, 356 F.3d 880, 888 (8th Cir. 2004). "A reasonable probability is a probability sufficient to undermine the confidence in the outcome." Woodford v. Visciotti, 537 U.S. at 23 (quoting Strickland, 466 U.S. at 694).

When a state court has addressed a petitioner's ineffective-assistance claims on the merits and applied the <u>Strickland</u> tests, the federal courts must accord the state court's determination "AEDPA deference" as required by 28 U.S.C. § 2254(d). <u>Rompilla v. Beard</u>, 545 U.S. at 380. Assuming no issue with respect to the state court's findings of fact, the federal court's review is limited to the determination of whether the habeas petitioner has met the burden of proving that "the state court applied <u>Strickland</u> to the facts of the case in an objectively unreasonable manner." <u>Woodford v. Visciotti</u>, 537 U.S. at 25; <u>see</u> <u>also</u> <u>Rompilla v. Beard</u>, 545 U.S. at 380.

Finally, when a defendant raises multiple claims of ineffective assistance, each claim must be examined independently. <u>Hall v. Luebbers</u>, 296 F.3d 385, 392-93 (8th Cir. 2002); <u>Griffin v. Delo</u>, 33 F.3d 895, 903-04 (8th Cir. 1994).

### B.      Claim 2(A) - failure to object to the gonorrhea evidence

Hernandez argues his trial counsel was ineffective in failing to object when the State elicited testimony from the emergency room pediatrician that L.H. tested positive for gonorrhea. (Ex. 25, p. 286-87). In addressing this issue, the state district court made the following findings:

> Mr Fisher testified that as a matter of trial strategy, he decided to handle the gonorrhea issues on cross examination. Mr. Fisher stated that in his perspective this would show the jury that Mr. Hernandez could not have been the one who infected the victim because of the incubation period. <u>Tr</u>. at 20-21. Mr. Fisher testified that he asked Evon Ortiz and Jennifer Haroldson whether they had gonorrhea (both former sexual partners of Mr. Hernandez) and both answered in the negative. <u>Tr</u>. at 22. Mr. Fisher also testified that he inquired about gonorrhea to Mr. Hernandez and whether he was personally infected. <u>Tr</u>. at 22-23. Mr. Fisher believed any reference the State made to the victim having gonorrhea was neutralized by this non-infection testimony as well as the fact that gonorrhea has an incubation period. <u>Tr</u>. at 22-23. Mr. Fisher testified that because the Information only alleged one incident of abuse, the gonorrhea could not have come from Mr. Hernandez because it would not have had time to incubate before the doctor's exam of the victim. <u>Tr</u>. at 22-23.

(P.C. Ex. 15, p. 4).

The record supports the forgoing findings. (Ex. 18, pp. 20-23, 26-27, 33-35). Moreover, the record supports what, at very least, is the implicit suggestion of the state district court that the reason counsel did not object was because he believed the evidence supported Hernandez's claim that the charged incident did not happen and that L.H. was having sexual relations with someone else.

Specifically, counsel was aware of the gonorrhea evidence prior to trial given that it was mentioned in the medical records. (P.C. Ex. 18, p. 20). Also, he knew that the prosecutor would likely inquire about the evidence given the prosecutor's reference to it during his opening statement. (Ex. 25, pp. 18). And, when the prosecutor did ask the emergency room physician about the positive test for gonorrhea, Hernandez's counsel was obviously ready.

Counsel's first question on cross-examination was about the incubation period, even though this had not been addressed by the prosecutor during the direct examination. He elicited the response that the incubation period was five days before an infected person would test positive, raising the implication that L.H. had sex with someone prior to the date of the alleged attack. (Ex. 25, pp. 288). Defense counsel then followed this up by presenting testimony from Hernandez and his girlfriend during the defense case that Hernandez had never been infected with gonorrhea. (Ex. 25, pp. 678, 712). Finally, during final argument, counsel used the gonorrhea evidence to support his arguments that the assault by the defendant never happened. (Ex. 25, pp. 867-868).

All of this supports the conclusion that Hernandez's counsel did not object when the prosecutor inquired about the positive test for gonorrhea because he believed he could use the evidence to Hernandez's advantage. In fact, it appears likely that Hernandez's counsel would have inquired about the positive test even if the prosecution had not. But, regardless of whether he would

have or not, the trial court's conclusion that the decision not to object was a strategic one that did not fall below prevailing professional norms is amply supported by the record.

There is a strong presumption that defense counsel's trial strategy was sound and not ineffective.  Johnson v. Norris, 537 F.3d 840, 848 (8th Cir. 2008) ("strategic decisions by counsel are 'virtually unchallengeable' unless they are based on deficient investigation"); Williams v. Bowersox, 340 F.3d 667, 672 (8th Cir. 2003).  The fact that the strategy was unsuccessful does not mean it was ineffective assistance counsel.  Flieger v. Delo, 16 F.3d 878, 886 (8th Cir. 1994).  This is particularly true here given the evidence favoring the prosecution and what little defense counsel had to work with.

In summary, the state district court's application of the first Strickland prong was not objectively unreasonable as to this issue.  Claim 2(A) should be denied on the merits.

### C.    Claim 2(B) - reliance upon Rule 404(b) instead of Rule 412 to challenge the introduction of the prior bad acts evidence

As noted earlier,  Hernandez's attorney made an oral motion in limine to exclude evidence of prior sexual contact between the defendant and the victim, citing Rule 404(b) of the North Dakota Rules of Evidence.  The trial court conditionally granted the motion stating:

> The Defendant's verbal motion pursuant to Rule 404(b), N.D.R.Ev., to suppress testimony about specific incidences of prior sexual misconduct by the Defendant against this same victim is granted unless or until further order of the Court.

(Ex. 11).

Hernandez argues that his attorney should have filed the motion pursuant to N.D. R. Evid. 412 because Rule 404(b) did not apply. The trial court made the following factual findings regarding this issue:

Mr. Fisher testified that at trial, he relied on his own trial expertise. Tr. at 24. Furthermore, Mr. Fisher stated that his decision not to argue Rule 412 was a tactical one. Tr. at 24. Based on the many exceptions that accompany Rule 412, he felt Rule 404 was more appropriate. Tr. at 24.

(P.C. Ex. 15, p. 4). The court then concluded that trial counsel's conduct did not fall below an objective standard of reasonableness.

The primary rule governing the admission of uncharged sexual conduct on the part of the defendant in North Dakota is N.D. R. Evid. Rule 404(b), since North Dakota does not have a counterpart to the Fed. R. Evid. 413 & 414. In contrast, N.D. R. Evid. Rule 412 prohibits "evidence offered to prove that any alleged victim engaged in other sexual behavior" and "evidence offered to prove any alleged victim's sexual predisposition." N. D. R. Evid. 412(a). The primary focus of the rule is to protect the victim from harassment and embarrassment, not govern the admission of bad acts of the defendant. Id.; cf. United States v. Bordeaux, 400 F.3d 548, 558 (8th Cir. 2005) (discussing Fed. R. Evid. 412).

In cases such as this, where the defendant's prior bad acts, which are the subject of Rule 404(b), involve sexual relations with a victim, which are the subject of Rule 412, the two rules appear to intersect. Subsection (b)(2) of Rule 412, however, eliminates most of the potential for any conflict by providing an exception to Rule 412's coverage when the prosecution seeks to introduce "evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct." Consequently, in terms of subject matter, Hernandez's counsel relied upon the correct rule when he made his motion in limine seeking to exclude evidence of the defendant's prior acts of sexual abuse on Rule 404(b) grounds.

Hernandez argues, however, that Rule 412(c)(1)  still requires the prosecution to file a motion fourteen days prior to trial if it wishes to offer evidence that is excepted from Rule 412's ban

38

under subsection (b) and that the prosecution in this case failed to file the motion.  Even if that provision applies, which is not certain given the  lack of clarity as to the intended interaction between Rules 404(b) and 412 in this situation, the trial court can for good cause under subsection Rule 412(c)(1) require a different time or allow the motion to be filed during the trial.

Here, the State did not seek to offer the prior acts evidence as part of its case-in-chief until the defense "opened-the-door" to the introduction of the evidence, at which point the prosecution orally moved the court to allow it.  This, coupled with the fact that defense counsel was not surprised by the evidence, as indicated  by his motion in limine, makes it highly unlikely that the trial court would have excluded the evidence if Hernandez's counsel had objected on the basis of Rule 412(c)(1).

Based on the foregoing, the trial court's conclusion that Hernandez's counsel performance with respect to this point did not fall below prevailing professional norms is objectively reasonable.  Claim 2(B) should be denied on the merits.

**D.   Claim 2(C) - claim of ineffectiveness for failing to object on hearsay and Confrontation Clause grounds to the physician testimony regarding L.H.'s statements of prior sexual relations**

Hernandez argues that his trial counsel was ineffective in failing to object to the physician testimony recounting statements made by L.H. concerning prior sexual relations with Hernandez on two other grounds: hearsay and the Sixth Amendment's Confrontation Clause.[8]   Respondent disagrees, arguing there was no ineffectiveness because the admission of the testimony did not violate the Confrontation Clause violation and was otherwise admissible under the hearsay exception

---

[8]  Claim 2(C) relates only to L.H.'s statements to the physicians recounting the prior acts of sexual abuse.  No claim has been made with respect to the physician testimony recounting statements made by L.H. identifying Hernandez as her attacker, either directly or indirectly by a claim of ineffectiveness on the part of counsel.

permitting statements made for medical diagnosis and treatment. The arguments of the parties raise a number of difficult legal issues, including whether AEDPA deference should be accorded this claim.

Many of the relevant facts are set forth in the prior excerpts from the North Dakota Supreme Court's discussion of Hernandez's relevancy objections to the prior bad acts evidence, which have been quoted from earlier. However, there are additional facts that must be gathered from the record since neither the state district court nor the North Dakota Supreme Court explicitly addressed the substance of Claim 2(C).

### 1.      Factual background re Claim 2(C)

The State called L.H. as its first witness. During its direct examination, the State did not elicit from L.H. any testimony about the incidents of prior sexual relations with Hernandez, which at that point were the subject of the conditional motion *in limine*. (Ex. 25, pp. 31-60).

During cross-examination, Hernandez's counsel also did not get into the subject for obvious reasons. (Ex. 25, pp. 60-92) But, when defense counsel inquired of L.H. why she did not call her mother when she had an opportunity to do so, there was a conference in chambers during which the State argued that defense counsel had "opened the door" to the State being able to ask why she did not call her mother. The State represented to the court that L.H.'s testimony would be that she did not tell her mother because Hernandez had been having sexual relations with her for a number of years. Over defense counsel's objections, the trial court ruled that counsel had opened the door and stated it would allow the prosecution to ask the question. (Ex.25, pp. 78-82). However, on redirect the State stopped short and did not elicit the testimony about prior sexual relations. When asked on

redirect as to why she did call her mother, L.H. responded simply that she did not plan on telling her mother about the rape, and the State settled for that answer.  (Ex. 25, pp. 95-96).

During the testimony of L.H.'s mother, there was further discussion about whether defense counsel had opened the door to the evidence of the prior sexual relations after defense counsel asked the mother whether Hernandez had always treated L.H. with respect before May 22, 2003, and L.H.'s mother responded "not exactly." After another chambers conference, the court allowed defense counsel to withdraw that question and response, but admonished that "one more time, if there's anything that gets remotely close to opening this door that is partway open now, I'm going to take the prosecutor's position on this."  (Ex. 25, pp. 173-175).

Later, in the prosecutions's case, the State called Dr. Anila Jacob.  Dr. Jacob was the emergency room pediatrician who examined L.H. along with a Sexual Assault Nurse Examiner ("SANE" nurse) when L.H. was taken to the emergency room for examination on the evening of the assault after she had told her mother she had been assaulted by Hernandez.  During the direct examination of Dr. Jacob, the State asked about testing that was done for sexually transmitted diseases and elicited the response that L.H. had tested positive for gonorrhea.  (Ex. 25, p. 286).

On cross-examination, the first question asked by defense counsel was how long after becoming infected with gonorrhea would it show up in a test, and the response by Dr. Jacob was about five days.  (Ex. 25, p. 288).  At the conclusion of defendant's cross-examination, there was another conference in chambers.  The State argued that defense counsel had again opened the door to the evidence of the prior sexual relations with defense counsel disagreeing and arguing it was the State that had raised the subject of gonorrhea for no other reason than to unfairly prejudice the defendant, which required him to respond.  The trial court ruled it would allow the State to rebut the

41

implication that had been created by defense counsel's cross-examination that L.H. had a sexual encounter prior to the day in question and was involved with someone other than the defendant, consistent with the Hernandez's overall defense  that L.H. and her mother had conspired to falsely implicate him because he had spurned the mother.  (Ex. 25, pp. 297-301).

On redirect of Dr. Jacob, and over the continued objections and motions for a mistrial by the defense, the State elicited the testimony that L.H. had told Dr. Jacob during the examination that she had been sexually assaulted by Hernandez on numerous occasions over the past seven years, with the most recent incident having been about a week prior to the assault on May 22, 2005.  (Ex. 25, pp. 303-305).

The State later called Dr. Norberg, a pediatrician who examined L.H. about six days after the May 22 examination for the purposes of following up on the claim of sexual abuse, checking on the status of the bruising of her genital area, and following up on the treatment for gonorrhea.  (Ex. 25, p. 327-328).   After another chamber's conference and over the objections of the defense, Dr. Norberg was permitted to testify that L.H. had told her that she had been sexually assaulted by Hernandez one week before May 22 and that she had been assaulted on other occasions as well.  (Ex. 25, pp. 330 -336, 343-345).

The next day defense counsel renewed his motion for mistrial, arguing, among other things, that the prosecutor had gone beyond what the judge had authorized in terms of responding to defense's counsel's cross-examination about the incubation period for gonorrhea, specifically that the sexual relations had been going on for seven years.  The court stated it too was concerned about the mention of the seven years, but denied the motion for new trial.  (Ex. 25, pp. 397-403).

Notably, during all of these conferences and exchanges, defense counsel never objected on hearsay or Confrontation Clause grounds.  The trial record suggests that both parties and the court assumed the statements made by L.H. to the two physicians were admissible under N.D. R. Evid. 803(4), apart from the relevancy concerns, because they occurred during the course of the physician examinations of L.H.   And, as already noted, Hernandez's counsel testified during the postconviction hearing that he did not object on hearsay and Confrontation Clause grounds for precisely this reason.  (P.C. Ex. 18, pp. 35-37).

The following are additional facts that also may be relevant:

• After the court ruled that the prior sexual acts evidence could come in,  L.H. was available to be recalled by the State as well as by Hernandez as part of the defense case.  During a conference in chambers following the introduction of the evidence defense counsel stated the following:

> Judge, I think those are so volatile in their nature that there is no cure that could be imposed on this case by instruction from the Court that we can't continue this trial in this fashion.  And if we do, it's going to be necessary to call the victim back and cross-examine her some more, and you've already expressed your view that that's not what you want to happen in this case.  The little girl has suffered enough.

(Ex. 25, pp. 398-399)

• One of the purposes of the initial examination at the emergency room was to gather evidence that would later be used by law enforcement.   During the initial examination, Dr. Jacob and the SANE nurse used a "rape kit" to collect the physical evidence to be turned over to law enforcement.   (Ex. 25, 272-317).

43

- The police came to the hospital on the evening of the emergency room examination and interviewed L.H. and her mother along with an employee from social services. The police were not present during the emergency room examination, but they did collect the "rape kit" evidence from the SANE nurse after it was completed. (Ex. 25, 350-362

- There is no evidence that the followup examination by Dr. Norberg was conducted at the behest of law enforcement authorities or that law enforcement authorities were present during the examination.

    2.    **Legal issues raised by Claim 2(C)**

        a.    **Whether the burden of exercising Sixth Amendment rights can be shifted to the defendant to call the declarant**

Hernandez relies primarily upon Crawford v. Washington, supra, and State v. Blue, supra. for his arguments that the physician testimony recounting L.H.'s statements about the prior acts of sexual abuse by Hernandez was hearsay and violated his Sixth Amendment confrontation rights.

In Crawford, the United States Supreme Court concluded that the admission of "testimonial" hearsay violates a defendant's Sixth Amendment confrontation rights unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. 541 U.S. at 68. In State v. Blue, the North Dakota Supreme Court applied Crawford to the admission of statements made by a child victim of sexual abuse to a forensic interviewer at a hospital, concluding that the statements were testimonial and that the defendant's confrontation rights had been violated when the child was not called by the State as a witness at trial. 2006 ND 134, at ¶¶ 6-27.

Respondent argues that there was no Confrontation Clause violation in this case because L.H. appeared and testified as a witness, albeit prior to the admission of the hearsay testimony in

question, and was available to be called by Hernandez as part of his defense case if he wanted to exercise his confrontation rights.  The only authority cited by Respondent for his argument, that the hearsay evidence can be admitted and the burden shifted to the defendant to exercise his or her Sixth Amendment rights to confront and cross-examine the accuser, is a  footnote in <u>Crawford</u> in which the Supreme Court stated that the Confrontation Clause places no restriction on the use of prior testimonial statements when the declarant appears for cross-examination at trial.  541 U.S. at 59 n.9.

The Court's discussion in the footnote, however, does not specifically address the burden-shifting issue.  Further, the Court's discussion of  "unavailability" in <u>Crawford</u> was in the context of the declarant not being available to be called as a witness by the state and as one of two conditions that would have to be satisfied before testimonial hearsay could be admitted without violating the Confrontation Clause, the other being a prior opportunity for cross-examination.[9]  At best, <u>Crawford</u> is silent with respect to Respondent's burden-shifting argument.

Prior to <u>Crawford</u>, the Supreme Court had stated generally that the burden of  producing the witness or demonstrating unavailability rests with the prosecution.  <u>E.g.</u>, <u>Idaho v. Wright</u>, 497 U.S. 805. 814-815 (1989); <u>Ohio v. Roberts</u>, 448 U.S. 56, 65 (1980).  Also, prior to <u>Crawford</u>, most of the lower court cases had concluded that the burden of exercising Sixth Amendment confrontation rights could not be shifted to the defendant.  <u>See</u>, <u>e.g.</u>,  <u>Shaw v. Collins</u>, 5 F.3d 128 (5th Cir. 1993); <u>State v. Rohrich</u>, 939 P.2d 697, 700-703 (Wash. 1997); <u>Felix v. State</u>, 849 P.2d 220, 247-248 (Nev. 1993)

---

[9]  In <u>Crawford</u>, the hearsay declarant was the wife of the defendant.  She was "unavailable" to the prosecution as a witness because the defendant had  exercised his rights under the state marital privilege laws, which barred a spouse from testifying without the other spouse's consent.  541 U.S. at 40. The Court concluded that the defendant's Sixth Amendment rights had been violated because "the State admitted Sylvia's testimonial statement against petitioner, despite the fact that he had no opportunity to cross-examine her." <u>Id</u>.  And, from the context of the other discussion, what the Court was obviously referring to there was the lack of the defendant's opportunity to cross-examine his wife when the evidence was offered by the prosecution and not some later opportunity.  In fact, there was nothing preventing the defendant from calling his wife as part of the defense case and foregoing his marital-privilege rights at that point.

superseded by rule on other grounds Evans v. State, 28 P.3d 498, 509 (Nev. 2001); Long v. State,

742 S.W.2d 302, 319-324 (Tex. Crim. App.,1987) overruled on other grounds Briggs v. State, 789

S.W.2d 918, 919 (Tex. Crim. App. 1990); Sosebee v. State, 357 S.E.2d 562, 563 (Ga. 1987).[10]  The

only case that the court could readily find that supports Respondent's argument is the Eighth

Circuit's decision in United States v. Cree, 778 F.2d 474 (1985), which, appears to have been

abandoned by the Eighth Circuit, at least with respect to its broader holding regarding the

application of the Confrontation Clause.  United States v. Spotted War Bonnet, 933 F.2d 1471 (8th

cir. 1991).[11]

　　　Nevertheless, the argument that Respondent makes has not been squarely addressed by the

Supreme Court and remains an open issue, at least at that level.  Also, even if the burden of

exercising Sixth Amendment rights cannot normally be shifted to the defendant, there may be an

argument for making an exception in a case, such as this, where the declarant appears and testifies

---

[10]  In Shaw v. Collins, the state presented a video-taped interview of a five-year old victim in a sexual assault case without first calling the victim.  When the defendant objected on confrontation grounds, the state trial court ruled the defendant could call the victim in its case-in-chief, which the defendant refused to do.  The defendant was convicted and the Fifth Circuit granted the defendant's habeas petition, concluding that the state's failure to call the victim violated the defendant's confrontation rights and was not in that case harmless error.  With respect to the argument that the defendant could have called the witness, the court stated:
　　　Requiring a criminal defendant to examine his accuser during his case-in-chief rather than mandating that the prosecution call the witness during its case-in-chief places the defendant in a no-win situation. Lowery v. Collins, 988 F.2d 1364, 1369-70 (5th Cir.1993). Such a requirement is inconsistent with the Confrontation Clause, for it requires the criminal defendant to either risk inflaming the jury by cross-examining the child-complainant or to avoid that risk by forgoing his Sixth Amendment rights to confront and cross-examine his accuser. Id. at 1369-1370.
5 F.3d at 132 n.7.

[11]  In Cree, the Eighth Circuit concluded that a defendant had "waived" his Sixth Amendment confrontation rights by not calling a child victim of sexual assault whose hearsay statements had already been admitted into evidence. 778 F.2d at 478.  However, the Eighth Circuit in Cree cited no authority for this holding and later acknowledged in United States v. Spotted War Bonnet that Cree and several other of its cases admitting hearsay evidence "did not subject the statements in question to the rigorous and carefully structured Confrontation Clause analysis that is now required by Wright" with respect to the broader issue of the application of the Confrontation Clause. 933 F.2d at 1473.  Further, the court in Spotted War Bonnet stated generally that "[t]he confrontation clause presents an obstacle to admitting hearsay statements only when the child does not testify in the state's case either because of unavailability or by choice of the prosecution." Id. (emphasis added).

about the acts directly related to the charged conduct and the burden-shifting relates only to hearsay statements involving prior bad acts.

**b.      Whether the statements made by L.H. to the medical personnel were "testimonial"**

Respondent also argues that the Confrontation Clause does not apply because the statements made by L.H. to the physicians were not "testimonial" within the meaning of <u>Crawford</u>.  In <u>Crawford</u>, the Supreme Court did not attempt to provide a comprehensive definition of what is a "testimonial" statement.  However, it did note three categories of statements that have traditionally been considered testimonial:

1.      " *ex parte* in-court testimony or its functional equivalent - that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;"

2.      "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and

3.      "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

541 U.S. at 51-52 (citations omitted).

Following <u>Crawford,</u> the Supreme Court in <u>Davis v. Washington</u>, 547 U.S. 813 (2006) addressed the third category of statements traditionally considered "testimonial" in the context of statements made to law enforcement officials in two separate state cases.  One case involved statements made during a 911 call and the other statements made to an investigator at the scene of

47

a domestic altercation. The Court held that the 911-call statements in the first case were not testimonial, but that the statements to the law enforcement officers at the scene of a domestic disturbance were, stating, in part, the following:

> Without attempting to produce an exhaustive classification of all conceivable statements-or even all conceivable statements in response to police interrogation-as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.

While the focus in <u>Davis</u> was upon statements made to law enforcement officials or their agents, the Court went on to say in a footnote:

> If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police. As in <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), therefore, *our holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are "testimonial."*

<u>Id.</u> at 823 n.2 (emphasis added). Also, the court stated in another footnote that the statements do not necessarily have to be made in response to an interrogation to be "testimonial" and that what is important is the character of the declarant's statements and not the interrogator's questions. <u>Id.</u> at 822-823 n.1.

Following <u>Crawford</u>, there have been a number of lower federal and state court cases that have grappled with the issue of whether incriminatory statements made by victims of sexual assaults to medical professionals are "testimonial" and subject to the Confrontation Clause. Some courts

have concluded that the statements are nontestimonial so long as it appears the declarant did not believe they would later be used at trial, even when there has been significant law enforcement involvement in obtaining the statements.  See, e.g., State v. Stahl, 2006 Ohio 5482, 855 N.E.2d 834 (Ohio 2006) (adult victim's statements describing sexual battery to nurse at a specialized facility designed to provide expert care to victims of violent sexual assault were nontestimonial even though the investigating police officer arranged for and attended the examination).

In other cases, the purposes for the medical examination and the degree of law enforcement involvement are more significant factors.  In these cases, the statements have generally been found to be nontestimonial when the predominate purpose for the examination is medical and there is little law enforcement involvement.  See, e.g., United States v. Peneaux, 432 F.3d 882, 895-896 (8th Cir. 2005); State v. Scacchetti, 711 N.W.2d 508, 513-516 (Minn. 2006) (applying an eight-factor test and concluding the statements were nontestimonial).  The opposite conclusion, however, has been reached when the examination is primarily for law enforcement purposes, or there is significant law enforcement involvement, thereby making the examination the functional equivalent of a law enforcement interrogation.  See, e.g., United States v. Bordeaux, 400 F.3d 548, 552 (8th Cir.2005) (statements made during a videotaped interview by a forensic examiner were testimonial), State v. Cannon, 254 S.W.3d 287, 304-306 (Tenn. 2008) (statements made during an examination by a SANE nurse held to be testimonial); Hernandez v. State, 946 So.2d 1270,  1278-86 (Fla. 2d Dist. Ct. App. 2007) (statements made during examination for sexual assault by a specially trained nurse held to be testimonial given significant law enforcement involvement and the lack of an emergency); State v. Hooper, 176 P.3d 911, 917 (Idaho, 2007) (videotaped statements by a forensic examiner were testimonial); State v. Blue, 2006 ND 558, ¶¶7-17 (same).

In still other cases, courts have either suggested or concluded that, apart from any law enforcement nexus, statements made to medical professionals may be testimonial when they name the perpetrator and the victim understands the statements could get the perpetrator in trouble. E.g., State v. Romero, 141 N.M. 403, ¶¶ 13-18, 156 P.3d 694, (N.M. 2007) aff'g 139 NM 386, ¶¶ 58-61, 133 P.3d 842 (N.M. Ct. App. 2006) (statements made by an adult victim during an examination by a "SANE" practitioner were deemed testimonial where the declarant understood that the statements would likely be used against the perpetrator - at least to the extent that the statements named the perpetrator); Commonwealth v. DeOliveira, 849 N.E.2d 218 (Mass. 2006) (concluding that statements made to a physician by a child victim of sexual assault describing the nature of the assault, but not identifying the perpetrator, were nontestimonial and noting an obligation under Crawford to separately determine apart from any law enforcement nexus whether the purpose of the statements was to incriminate and bear witness against the accused); see People v. Vigil, 127 P.3d 916, 921-926 (Colo. 2006) (en banc) (allowing the hearsay testimony, but noting that the trial court had not permitted the child to identify the perpetrator by name).

As noted above, the Supreme Court has yet to decide the extent to which statements that are testimonial in nature, but are made to persons other than law enforcement officials or their agents, are subject to the Confrontation Clause. Also, the Supreme Court observed in connection with the 911 call in Davis that, once the information required to address the emergency has been obtained, a declarant's statements may become testimonial and, in that situation, a court would likely be able to redact those statements. 547 U.S. at 828-829.

Consequently, there is the possibility that the Supreme Court could decide, as some lower courts already have or suggested, that statements made by a sexual assault victim during a medical

examination may be deemed testimonial when made with the understanding that the statements might get the perpetrator in trouble, regardless of any law enforcement involvement in procuring the statements. And, this may be particularly true for the portions of the statements naming the perpetrator.

Based on the lower federal and state court cases cited above and <u>Crawford</u> and <u>Davis</u> generally, the arguments for concluding that L.H.'s statements were nontestimonial in this case include the fact that there was some medical purpose for the physician examinations and the lack of direct law enforcement involvement. The arguments for reaching the opposite conclusion include:

- The fact that the primary purpose for the mother taking L.H. to the emergency room was to determine whether she had been raped and not for other medical treatment.

- The statements made by L.H. to the emergency room doctor and the SANE nurse were hours after the assault, were made in a controlled setting, and were not under emergency circumstances.

- The statements made by L.H. were a recitation of past events and were accusatory in nature.

- L.H. was twelve years old. While she may not have understood all of the workings of the criminal process, she certainly was able to appreciate that what she was recounting might be reported to and relied upon by law enforcement authorities and that the statements could get Hernandez in trouble.

- The SANE examination[12] conducted jointly by the SANE nurse and the emergency room pediatrician, at least in part, was a forensic examination for law enforcement purposes, including gathering evidence to turn over to law enforcement authorities.

c.    **Whether the Confrontation Clause applies to nontestimonial statements**

After Crawford, the Eighth Circuit, along with most of the other federal circuit courts, continued to apply pre-Crawford confrontation clause law under Ohio v. Roberts, 448 U.S. 56 (1980) to nontestimonial statements.  See  United States v. Brun, 416 F.3d 703, 707 (8th Cir. 2005); see generally C. Mueller & L. Kirkpatrick, 4 Federal Evidence § 8:30 (3d ed.).  This was the state of the law at the time of the trial in this case.  But, there is a substantial question whether this approach is still good law in light of the Supreme Court's later decision in Davis.

At least two federal circuit courts have concluded that Davis has foreclosed the use of pre-Crawford confrontation clause law to nontestimonial statements, but at least one circuit court has reached the opposite conclusion.  Compare  Garrison v. Ortiz,  2008 WL 4636723, *2 (10th Cir. 2008) (unpublished order); United States. v. Feliz, 467 F.3d 227, 231 (2d Cir. 2006) with  United States. v. Thomas, 453 F.3d 838, 844 (7th Cir. 2006) (continuing to apply Ohio v. Roberts to nontestimonial hearsay); see generally 4 Federal Evidence at § 8:30.  The North Dakota Supreme Court has also suggested since Davis that it too would apply pre-Crawford confrontation clause law to nontestimonial statements.  State v. Blue, 2006 ND 134, at ¶21.

The significance of this issue is that, prior to Crawford, the Eighth Circuit held in Olesen v. Class, 164 F.3d 1096 (8th Cir. 1999), that a state defendant's confrontation rights had been violated

---

[12] SANE practitioners are medical professionals with special training in conducting forensic examinations of sexual assault victims.  E.g., State v. Ortega, 143 N.M. 261, ¶ 21, 175 P.3d 929 (N.M. Ct. App. 2007); see http://www.ojp.usdoj.gov/ovc/publications/bulletins/sane_4_2001.

and granted habeas relief when a doctor was permitted to testify as to statements made by a child

victim that identified the defendant as the abuser.[13]

**d.      Whether the physician testimony as to L.H.'s statements about
the prior sexual acts was inadmissible hearsay apart from any
Confrontation Clause violation**

The court is not aware of any North Dakota Supreme Court cases that have directly

addressed the issue of whether statements made to physicians detailing prior uncharged acts of

sexual abuse are admissible under N.D. R. Evid. 803(4), particularly those that identify the

perpetrator.  Conceptually speaking, this could involve two issues: The first is whether statements

identifying the perpetrator fall within the scope of the exception.  The second is the degree to which

statements about prior acts fall within the exception, particularly if the information is not necessary

for the immediate diagnosis or treatment.

In State v. Janda, 397 N.W.2d 59 (N.D. 1986), the North Dakota Supreme Court discussed

the admissibility of statements identifying a sexual abuser under N.D. R. Evid. 803(4) with respect

to the charged conduct. The court noted several cases from other jurisdictions permitting testimony

identifying the perpetrator under the exception for statements for medical diagnosis or treatment in

cases of child sexual abuse on the theory that the information is needed in order to properly

diagnosis and treat the possibility of psychological damage.  The court concluded, however, that it

---

[13]   In Olesen, the state court had admitted the hearsay under a state-law exception allowing statements for
purposes of medical diagnosis and treatment, which was the equivalent of Fed. R. Evid. 803(4).  Applying pre-Crawford
Confrontation Clause law under Ohio v. Roberts, the Eighth Circuit concluded that this exception did not apply to
statements identifying the abuser unless the prosecution had made clear to the victim that the inquiry was important to
the diagnosis and treatment and the victim manifested such an understanding.  The court held that the state had failed
to make this showing.  164 F.2d at 1097-98. The court also rejected the state's arguments that the statements possessed
a sufficiently particularized guarantee of trustworthiness to otherwise be admissible under Ohio v. Roberts and that the
statements were harmless.  Id. at 1098-1101.  In reaching these conclusions, the Eighth Circuit must have implicitly
concluded that the deeply-rooted hearsay exception for statements made for purposes of medical treatment or diagnosis
does not include statements identifying the abuser, at least absent certain conditions being met, which, apparently, was
an issue left open in White v. Illinois, 502 U.S. 346, 351 n.4 (1992).

53

did not have to decide the issue.  Id. at 62-63 & n.3.  And, since Janda, it does not appear that the court has revisited the issue.[14]

In the Eighth Circuit, it is questionable whether those parts of L.H.'s statements to the physicians identifying Hernandez as the perpetrator of the prior acts of sexual abuse would be admissible under Fed. R. Evid. 803(4), particularly since Hernandez was not part of the victim's household.  See, e.g., United States v. Bercier, 506 F.3d 625, 631-632 (8th Cir. 2007); United States v. Peneaux, 432 F.3d at 893-894; United States v. Gabe, 237 F.3d at 957-959.  In other jurisdictions, however, there is little consensus as to whether, or under what circumstances, statements identifying the perpetrator of a sexual assault are admissible if made for purposes of medical diagnosis or treatment, with some courts being much more permissive in terms of allowing such statements than the Eighth Circuit.  Compare, e.g., Taylor v. State, __ S.W.3d __ , 2008 WL 4724147, *2-13 (Tex. Ct. Crim. App. 2008) (extensively discussing the subject and following Eighth Circuit case law) with United States v. McCabe, 131 F.3d 149 (Table), 1997 WL 753348, *9 (9th Cir. 1997) (citing  United States v. George, 960 F.2d 97, 99-100 (9th Cir.1992)); United States v. Joe, 8 F.3d 1488 (10th Cir. 1993); Morgan v. State, __ So.2d ___, 2008 WL 2345943, *2 (Miss. Ct. App. 2008); Ex Parte C.L.Y., 928 So.2d 1069, 1073 (Ala. 2005).

In summary, at the time of the trial in this case, it was unclear whether the hearsay testimony about the prior bad acts was admissible under N.D. R. Evid. Rule 803(4), particularly that part which identified Hernandez as the perpetrator.  The same remains true today.

**e.     Whether AEDPA deference applies to Claim 2(C)**

---

[14]   In State v. Muhle, 2007 ND 132, ¶ , 737 N.W.2d 647, the court did uphold the admission of hearsay statements made by child victims under Rule 803(4), which may have included statements identifying the perpetrator, although it is somewhat difficult to tell from the facts.  If so, there was no separate discussion about whether the portions of the hearsay statements naming the abuser should have been admitted.

In determining whether AEDPA deference must be accorded a state court's decision, the focus is upon the result along with any reasoning that the court may have given.  Brown v. Luebbers, 371 F.3d 458, 467 (8th Cir. 2004) (en banc); see Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam). Neither the summary nature of the state court's decision nor the absence of reasoning is a *per se* bar to reaching the conclusion that it was not directly contrary to federal law.  Id. Nevertheless, when a federal claim has not been adjudicated by the state court on the merits,  AEDPA deference is not appropriate, since § 2254(d), by its terms, applies only when the state court has made a merits determination.  E.g., Brown v. Luebbers, 371 F.3d at 460-461; Taylor v. Bowersox, 329 F.3d at 967-968.

In this case, the state district court did not explicitly address the claim of ineffectiveness based upon the failure of counsel to object on hearsay and Confrontation Clause grounds to the physician testimony recounting L.H.'s statements of prior sexual abuse - despite the fact that both parties briefed the issue.   In fact, in its memorandum opinion, the state district court characterized the claim as one of failing to recall L.H. and her mother for cross-examination after the gonorrhea evidence was admitted, and the court gave no indication that the claim involved more than that.

In other words, this is not a case where the state court was simply silent in its reasoning but otherwise made clear the claim was resolved on the merits.   Here, the state district court's characterization and discussion of the claim leaves open the real possibilities, among others, that it overlooked the hearsay and Confrontation Clause arguments or decided *sub silentio* that they did not need to be addressed on procedural grounds because of the manner in which Hernandez initially phrased the claim.

Under these circumstances, it is doubtful that AEDPA deference can be afforded Claim 2(C). See, e.g., Muth v. Frank, 412 F.3d 808, 815 n.5 (7th Cir. 2005) (AEDPA deference does not apply when the court considers a claim other than the petitioner's claim); Clemons v. Luebbers, 381 F.3d at 757 (stating it was not clear the state court had addressed a claim on the merits when it addressed only a subsidiary claim); Appel v. Horn, 250 F.3d 203, (3d Cir. 2001) (AEDPA deference does not apply where the state court misunderstood a properly preserved federal claim); Moore v. Dwyer, 2008 WL 2952195, *12 (E.D. Mo. 2008) (concluding that AEDPA deference did not apply when state court ignored or misconstrued petitioner's constitutional claim).

And, if AEDPA deference is not appropriate, then the pre-AEDPA standard of *de novo* review applies to questions of law and mixed questions of law and fact.  See Brown v. Allen, 344 U.S. 443 (1953); Williams v. Taylor, 529 U.S. at 400-402 (O'Conner, J. concurring opinion); Canaan v. McBride, 395, F.3d 376, 383 (7th Cir. 2005); Clemons v. Luebbers, 381 F.3d at 756 n.8; Taylor v. Bowersox, 329 F.3d at 967-68; Robinson v. Crist, 278 F.3d 862, 865 (8th Cir.2002) (citing Washington v. Schriver, 255 F.3d 45, 55 (2d Cir.2001));  Appel v. Horn, 250 F.3d at 211-12.

### 3. Hernandez has failed to demonstrate that his counsel was ineffective in failing to object to the physician testimony of  L.H.'s statements about the prior sexual  abuse

While "the Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim," Engle v. Isaac, 456 U.S. 107, 134 (1982), counsel are expected to advance defenses that are substantial.  E.g., Brunson v. Higgins, 708 F.2d 1353, 1356 (8th Cir. 1983).   And, in a situation where the law is uncertain, this can include interposing an objection to preserve a claim, particularly when there is significant potential benefit to the defendant and the

costs of doing so - strategic or otherwise - are insignificant.  See  Nichols v. United States, 501 F.3d 542, 546-547 (6th Cir. 2007).

At the time of the trial in this case, which was late in 2005, counsel in other cases had recognized and raised the same kinds of  hearsay and Confrontation Clause issues presented here. See, e.g., Olesen v. Class, supra.  Also, as noted, the North Dakota Supreme Court had expressly left open the issue of whether statements identifying the perpetrator fall within the scope of N.D. R. Evid. 803(4). State v. Janda, supra.  Finally, Crawford, had just been decided earlier that year and potentially expanded the scope of Confrontation Clause arguments that could be made.

On the other hand, counsel testified that the reason he objected to the physician testimony in question only on relevancy grounds was because he believed the testimony was otherwise admissible under the exception for statements made for medical diagnosis and treatment and did not present a Confrontation Clause issue.  As noted above, there were cases in other jurisdictions then, and there are cases now, that would support these conclusions.  This includes the Supreme Court's decision in White v. Illinois, 502 U.S. 346 (1992), at least when applying the result to the facts of the case and ignoring the caveat in footnote 4, since Crawford did not purport to explicitly overrule White.  Moreover, when the final chapter is written with respect to the hearsay and Confrontation Clause issues raised in this case, counsel's conclusions may ultimately be proved to be correct.

Also, just because there were hearsay and Confrontation Clause objections that could have been raised, does not necessarily mean it would have been good trial strategy to have asserted them. Once the trial court ruled that the prior acts evidence could come in, Hernandez's counsel might very well have decided not to object even if he had recognized the possible viability of the hearsay and Confrontation Clause objections.  For example, he may have preferred that the prior acts

evidence come in through the brief, and arguably more "sterile," physician testimony, rather than having the State recall the victim and, perhaps, engender more sympathy for her and more prejudice against Hernandez.  In fact, as recited elsewhere, there is evidence in the record that supports this being a concern along with the likelihood that the State would not recall the victim if it was able to introduce the prior bad acts evidence through the physician testimony.

On balance, and applying no AEDPA deference, Hernandez has failed to demonstrate that his counsel's counsel performance fell below prevailing norms and was ineffective in failing to object on hearsay and Confrontation Clause grounds given the particular circumstances of this case, including:

- the fact that counsel's decision not to object was based upon a reasoned judgment that the hearsay testimony fell within a recognized exception and did not present Confrontation Clause concerns;

- the uncertainty in the case law at the time and the fact that there were decisions supporting counsel's conclusions;

- the fact that counsel was a highly experienced defense attorney who mounted an aggressive defense and interposed numerous other objections, including objecting to the physician testimony about the prior bad acts on Rule 404(b) grounds and objecting to the testimony of L.H.'s mother when she attempted to testify about statements made to her by L.H. about the details of the rape and who committed it (Ex. 25, pp. 122-125);

- the fact that counsel was aware, once his relevancy objections were overruled,  that the State would likely be allowed to present the prior bad acts evidence by recalling

58

the victim, which was something that he wanted to avoid as indicated by his

statements during the trial and his postconviction testimony; and

• the fact that counsel made these judgments during the "heat of battle."

Cf. Lundgren v. Mitchell. 440 F.3d 754, 774 -775 (6th Cir. 2006); Anderson v. United States, 393

F.3d 749, 754 -755 (8th Cir. 2005).

### 4. Hernandez has failed to satisfy the second Strickland prong with respect to Claim 2(C)

Hernandez's defense in this case was that the sexual assault did not happen and that L.H.

fabricated the attack at her mother's behest because Hernandez had spurned her mother for another

woman.  Hernandez testified that, on the day in question, he, L.H.'s mother, L.H.'s younger brother

(whom  Hernandez fathered with L.H.'s mother out-of-wedlock), and L.H. all gathered at a local

motel so that the kids could  go swimming, and that the only sexual activity that occurred was an

attempt by L.H.'s mother to have sex with Hernandez while the kids were in the pool.  Hernandez

claimed this attempt was unsuccessful because his upper body was still in a halo device as a result

of an automobile accident, which he argued also made impossible the claimed  sexual assault upon

L.H.

    In addition to this testimony, Hernandez also developed a number of additional points in

support of his defense that the assault never took place.  He presented the testimony of one of his

friends who claimed that he observed the entire family at the motel on the day in question, contrary

to the testimony of L.H. and her mother that the family had not gathered there and that the only two

persons at the motel were Hernandez and L.H.  He brought out the fact that Hernandez drove L.H.

and her mother to the emergency room to be examined.  He pointed to certain inconsistencies in

L.H.'s accounts of the assault and to the fact that she did not flee or call for help, either before or

after the assault, despite having had several opportunities to do so.  He also brought out several acts and statements on the part of L.H.'s mother, which he argued were inconsistent with his having committed the alleged offense and/or consistent with an intent to frame him, including: (1) statements that, if she could not have Hernandez, she would not allow anyone else to have him; (2) acts of harassment against other women that she believed Hernandez was involved with; (3) the fact she had sexual relations with Hernandez on at least one occasion after the assault upon L.H.;  (4) evidence that she gave money to Hernandez after the assault, both before and after he was arrested; and (5) evidence that she visited Hernandez at the jail after he was arrested.

While Hernandez's attorney mounted an aggressive defense,  there were other explanations countering most of what he presented.  For example, Hernandez took off after dropping L.H. and her mother at the emergency room and eluded authorities for some time thereafter.  (Ex. 25, pp. 59, 151, 355-356, 416).  There was evidence that, by the time of the alleged assault, Hernandez was close to recovering from the injuries sustained in the automobile accident, that he was not totally immobilized by the halo device and that he could engage in other activity, including in sexual relations. (Ex. 25, pp. 36, 49-50, 87, 110-111, 117, 172). The corroborating testimony provided by Hernandez's associate was suspect given his friendship with Hernandez, his felony record, and the fact that he could have mistaken the day in question for other instances in which the "family" rented motel rooms so the kids could swim.  (Ex. 25, pp. 655-665).  The inconsistencies in the accounts given by L.H. were not major and the fact she did not run or call for help could be explained by a number of things, including embarrassment, Hernandez's position of dominance, and her mother's affection for Hernandez.  The explanations for L.H.'s mother's sometimes questionable behavior included her complicated relationship with Hernandez, the fact Hernandez was the natural father of

her other child, and her testimony that, at the end, she was willing to lure Hernandez with sex so law enforcement authorities could catch him.  (Ex. 25, pp. 131, 150-170, 195-228, 421-423).

But, more important, however, is the other evidence in the case, which was very heavily weighted against Hernandez.  In particular, the following corroborates the testimony of L.H. and her mother and not only eliminates any reasonable probability of a jury reaching a different conclusion under the second <u>Strickland</u> prong had the prior bad acts evidence been excluded,[15] but also renders the admission of the prior bad acts evidence harmless under the <u>Brecht</u> standard:

- The letter that L.H.'s mother testified was left in her door sometime after the assault, which the evidence overwhelming indicates was written by Hernandez.  In the letter, Hernandez acknowledged having sex with L.H., but claimed it was consensual, which was not a defense to the crime charged, *i.e.*, statutory rape.   He also urged L.H.'s mother to tell the authorities that she did not want Hernandez prosecuted. <u>Hernandez</u>, 2005 ND 214 at ¶ 10.

  While Hernandez denied writing the letter, the testimony of the handwriting expert to the contrary is persuasive.  (Ex. 25, pp. Ex. 445-515, 792-808).  And, even more persuasive, is the particular language used in the letter, which overwhelming supports  it having been written by Hernandez and not by L.H.'s mother, which was the only other possibility based upon Hernandez's defense that he was framed.  For example, the letter stated:  "I don't deny that I got involved with her but she gave it to me voluntarily," and, at another point, "[d]o you remember when she went with

---

[15]   This is giving Hernandez every benefit of the doubt since the State may very well have recalled L.H. to testify about the prior bad acts if the physician testimony had been objected to on hearsay and Confrontation Clause grounds and the court had sustained the objections.

me before that in the red truck and she came back with a smile from ear to ear because that day she was able to get it off twice and she was really happy." Hernandez, 2005 ND 214 at ¶¶ 10, 14.  Also, there were statements in the letter that it was L.H. who initiated the sexual encounter on the day in question and that, when he could not satisfy her, she got mad and made fun of him, stating "that after the accident I was not good for sex anymore." Id. at ¶ 14. Whatever might have been the faults of L.H.'s mother, no juror would have concluded that she would have used language like this in fabricating a letter.

- The physical evidence indicating that L.H. had been engaged in recent sexual activity.  This included the evidence of fresh bruising within L.H.'s vagina that later resolved itself within a week as expected.  (Ex. 25, pp. 280, 289, 293-294).  It also included the presence of semen in swabs taken by the emergency room physician from L.H., which were tested by the hospital lab apart from the rape kit. (Ex. 25, pp. 285, 291, 321).

- The testimony of the motel desk clerk that L.H. entered the office asking for a room key so that she could retrieve her glasses and that she appeared distraught, which corroborated L.H.'s testimony that she went back to the motel room to retrieve her glasses and had to first stop and get a room key from the clerk. (Ex. 25, pp. 53-4, 228-237).

### 5.    Summary with respect to Claim 2(C)

In summary, after having carefully reviewed the record and without applying AEDPA deference, Hernandez has failed to prove that his counsel's performance fell below prevailing noms

under the first Strickland prong and has failed to demonstrate with respect to the second prong that there is a *reasonable* probability that, but for counsel's alleged errors in failing to object to the physician testimony on hearsay and Confrontation Clause grounds, the result of the proceeding would have been different.  Claim 2(C) should be denied on the merits.

### E.     Claim 2(D) - defense counsel opened  the door to the introduction of the prior uncharged conduct evidence

Hernandez complains that defense counsel was ineffective because he "opened  the door" to the introduction of the evidence of the uncharged prior sexual abuse by inquiring about the incubation period  for gonorrhea.  But, as already discussed, this was a strategic decision made by trial counsel who had few alternatives.  Further, given the circumstances, it would have been difficult to mount an aggressive defense challenging the testimony of the victim's account as having been fabricated without opening the door.[16]  In fact, the trial court had ruled that defense counsel had already opened the door during his cross-examination of the victim prior to the gonorrhea evidence being introduced, but the prosecution decided not to pursue the matter further at that time.

For all of these reasons, Hernandez has failed to satisfy the first Strickland prong and demonstrate that his counsel was ineffective with respect to this issue.  Cf. Chestnut v. McDonough, 199 Fed.Appx. 853, 2006 WL 2827869, *2 (11th Cir. 2006) (unpublished per curiam) (concluding that the decision to cross-examine the victim of a sexual assault was strategic, and not ineffective assistance, even though it "opened the door" to prejudicial uncharged sexual conduct).  Further, for

---

[16]   Hernandez's counsel vigorously cross-examined L.H. about the why she got into the car with Hernandez in the first place, since she testified she knew what was likely going to happen, and why she did not take advantage of opportunities to flee. The fact she had been sexually abused by Hernandez for years would seem to be highly relevant in terms of providing an explanation for her conduct.

the reasons, expressed with respect to Claim 2(C), Hernandez has failed to satisfy the second

Strickland prong.  Claim 2(D) should be dismissed on the merits.

###### F.    Claim 2(E) - defense counsel failed to recall the victim and her mother for additional testimony

Hernandez argues his attorney was ineffective in not recalling the complainant and her

mother for additional testimony regarding the source of the complainant's gonorrhea and the

testimony relating to allegations of prior sexual abuse unrelated to the charged conduct.  The trial

court made the following factual findings, which are supported by the record:

> Mr. Fisher testified that he believed the jury had heard enough from the victim's mother. Tr. at 30.  He stated that she was a difficult witness for the prosecution and the defense because she was an advocate for the victim. Tr. at 30.  Mr. Fisher stated that he chose not to recall the victim because of the pitfalls that can be associated with cross examining a witness of a relatively young age. Tr. at 25.  Mr. Fisher felt she was a well-rehearsed witness and to recall her would not be productive. Tr. at 25. Mr. Fisher believed that it would be better to address any of these issues in closing rather than on re-cross. Tr. at 26.

(P.C. Ex. 15, p. 5).

A careful review of the trial record indicates that the decision not to recall L.H. and her

mother and handle any remaining matters in closing argument was not an unreasonable trial strategy.

This is particularly true given that counsel had already subjected L.H. and her mother to vigorous

cross-examination. (Ex. 25, pp. 60-92, 96-98, 164-213, 222-228).  Morever, Hernandez provides

nothing but speculation and vague references to "inconsistencies" to support his argument that

anything could have been accomplished by recalling L.H. and her mother.

The trial court's conclusion that counsel was not ineffective in failing to recall L.H. and her

mother to testify was not objectively unreasonable.  Claim 2(E) should be denied on the merits.

###### G.    Claim 2(F) - defense counsel failed to request a continuance to prepare a defense against the introduction of the gonorrhea evidence

Hernandez argues his trial counsel was ineffective in failing to request a continuance after testimony was introduced that the complainant tested positive for gonorrhea. Hernandez argues this would have allowed the defense time to prepare a defense regarding the source of the infection and that counsel should have tried to prove that someone other than Hernandez was the source. The State argues that such a decision is a matter of trial strategy and points out that defense counsel did move for a mistrial.

The trial court made the following factual findings regarding this issue:

> Mr. Fisher testified that he believed the best course of action was to handle the gonorrhea testimony on cross-examination, for tactically he believes that once a trial begins time is critical and therefore decided against requesting a continuance. Tr. at 26.

(P.C. Ex. 15, 4).

Hernandez fails to explain how a request for a continuance would have been helpful or who the alternate source of the infection might have been. Morever, as chronicled earlier, defense counsel vigorously pursued the gonorrhea issue by raising it with the emergency room doctor, eliciting testimony from Hernandez and his girlfriend that Hernandez did not have gonorrhea, and arguing the issue to the jury. The trial court's conclusion that defense counsel followed a reasonable trial strategy in dealing with the matter as he did and not seeking a continuance is objectively reasonable. Claim 2(F) should be dismissed on the merits.

## H.   Claim 2(G) - defense counsel failed to call the defense's handwriting expert as a witness

Hernandez claims that counsel was ineffective in not calling the handwriting expert that counsel retained to counter the evidence offered by the State's expert. The trial court made the following factual findings regarding this issue, which are supported by the record:

> Mr. Fisher testified that before trial he had requested a continuance so that he could obtain an expert's input on the issue. Tr. at 27.  However, the expert he spoke to could not provide any testimony that would have benefitted Mr. Hernandez and therefore Mr. Fisher elected not to call him to testify. Tr. at 27.  Mr. Fisher stated that if his expert could have provided information that was helpful to Mr. Hernandez's case, then he would have called the expert to testify. Tr. at 27.  Mr. Fisher believes that he did a "pretty good job of disrupting the credibility of Mr. Lybeck [State's expert]" Tr. at 28.

(P.C. Ex. 15 at p. 5).

Obviously, the decision on whether or not to call the defense handwriting expert was a strategic one that is entitled to a presumption of correctness.  During the state-court postconviction hearing, Hernandez offered nothing of substance to counter his trial attorney's testimony that the testimony of the defense expert would not have been helpful and that the best strategy was simply to conduct a vigorous cross-examination of the State's expert.  Further, the record reflects that Hernandez's attorney carried out that strategy by thoroughly and vigorously cross-examining the State's expert.  (Ex. 25, pp. 498-508, 512-13, 515-16 804-08).

The trial court's conclusion that counsel was not ineffective in failing to call the defense expert is objectively reasonable.  Claim 2(G) should be denied on the merits.

**I.      Claim 2(H) - defense counsel failed to object to prosecutorial misconduct which destroyed the presumption of innocence.**

Hernandez argues that his counsel was ineffective in not objecting to the following statement by the prosecutor during final argument:

> I want to draw your attention to the burden of proof and the presumption of innocence.  We talked about this when we went through jury selection last week.  I want to give you an example of what that means.  If I picked up this pitcher of water and I went back to the bailiff at the end of the room, in front of all of you, and I bashed him on the head with that bottle of water, I'm presumed innocent.  That's all it means.  Even though everybody saw me do it, I'm presumed innocent.

66

(Ex. 25, p. 838).  Hernandez contends that the statement destroyed the presumption of innocence.

The trial court made the following factual findings with respect to this claim, which are supported by the record:

> Mr. Fisher testified that he did not believe the State destroyed the presumption of innocence. Tr. at 29.  Mr. Fisher testified in his trial experience the State tries to strip away the presumption of innocence the best they can in this adversarial system, however, he did not believe the presumption was neutralized in this particular trial. Tr. at 29-30.

(P.C. Ex. 15, p 5).

Hernandez does not explain why the prosecutor's statement destroyed the presumption of innocence, contrary to his trial attorney's testimony that he did not believe it did so.  (P.C. Ex. 19, p. 29).  The point the prosecutor was making, albeit somewhat inartfully since witnesses to a crime can never be seated as jurors, is that all defendants begin the trial with the presumption of innocence, even in the face of overwhelming evidence.  This is not a misstatement of the law.  Morever, even if it was borderline, the trial court's conclusion that counsel was not ineffective in failing to object was objectively unreasonable.[17]  Claim 2(H) should be denied on the merits.

## VII.   CERTIFICATE OF APPEALABILITY

---

[17]    The end result would be no different if Hernandez's counsel had objected and raised this issue as a matter of prosecutorial misconduct on direct appeal. The relevant inquiry in assessing whether a prosecutor's closing argument has created error is whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  And, in order to justify federal habeas relief, the closing argument must be so inflammatory and outrageous that any reasonable trial judge would have declared a mistrial *sua sponte*. James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999).  This certainly was not the case here.  Moreover, the prosecutor stated the following immediately after the allegedly objectionable statements:
> Let's talk about the standard of proof, the reasonable doubt thing.  I'm real familiar with it. We welcome it.  It's the law of the land, and it is beyond a reasonable doubt.  It's not beyond all doubt.  It's not beyond a shadow of a doubt.  It's beyond reasonable doubt.
(Ex. 25, p. 838).  Consequently, even if the prosecutor's statements bordered on being improper, the discussion about the burden of proof that immediately followed refocused the jury on what it was obligated to find. Cf. United States v. Two Elk, 536 F.3d 890, 907-908 (8th Cir. 2008); United States v. Foley, 508 F.3d 627, 637-638 (8th Cir. 2007).

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right.  When the court has rejected a petitioner's claim on the merits, the substantial showing required is that the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also, United States v. Lambros, 404 F.3d 1034, 1036-1037 (8th Circ. 2005); Garrett v. United States, 211 F.3d 1075, 1076-1077 (8th Cir. 2000).  When the court denies a petitioner's claim on procedural grounds without reaching the merits, the petitioner must demonstrate that reasonable jurists would find it debatable that a valid claim for the denial of constitutional rights has been stated and that the district court was correct in its procedural ruling. Slack, 529 U.S. at 484.

In this case, the only assessment that may be "debatable" is that counsel was not ineffective in failing to object to the physician testimony on hearsay and Confrontation Clause grounds, but, even with respect to that claim, what is not "debatable" is the fact that Hernandez failed to satisfy the second Strickland prong.  Consequently, it is recommended that the court not issue a certificate of appealability.

VIII.   **ORDER and RECOMMENDATION**

Based on the foregoing, it is hereby **ORDERED** that Hernandez's petition be amended to include what the court has characterized above as Claims 2(C) and 2(D).  Also, the following are **RECOMMENDED**:

1.      That the State's motion to dismiss be **GRANTED** and Hernandez's Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, as amended, be **DENIED** for the reasons set forth above.

2.      That a certificate of appealability not be issued with respect to any of the issues raised by Hernandez.

### NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to these recommendations within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.  In this case, given the complexity of the issues and the fact that Hernandez is incarcerated, the court grants the parties twenty days (20) to file objections, with the understanding that additional time may be granted should that become necessary.

Dated this 24th day of November, 2008.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge